**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | |
|---|---|
| HOUND PARTNERS OFFSHORE FUND, LP, HOUND PARTNERS LONG MASTER, LP, HOUND PARTNERS CONCENTRATED MASTER, LP, and BLACKWELL PARTNERS LLC – Series A, <br><br> Plaintiffs, <br><br> v. <br><br> MOHAWK INDUSTRIES, INC., JEFFREY S. LORBERBAUM, FRANK H. BOYKIN, and BRIAN CARSON, <br><br> Defendants. | Civ. A. No. _____ <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND STATE LAW <br><br> <u>JURY TRIAL DEMANDED</u> |

# **TABLE OF CONTENTS**

**Page**

I.   SUMMARY OF THE ACTION.................................................................2

II.   JURISDICTION AND VENUE..................................................................10

III.   THE PARTIES ...........................................................................................11

    A.   Plaintiffs ..........................................................................................11

    B.   Defendants.......................................................................................12

IV.   NUMEROUS CONFIDENTIAL WITNESSES HAVE CONFIRMED THAT MOHAWK AND ITS EXECUTIVES WERE ENGAGED IN A LONG-RUNNING FRAUD .................................................................16

V.   FACTUAL BACKGROUND......................................................................18

    A.   Mohawk's Business.........................................................................18

    B.   LVT's Growth As An Alternative To Conventional Flooring Products Threatens Conventional Flooring Products.........................21

    C.   Mohawk Purchases An LVT Manufacturer .....................................22

    D.   Mohawk Reports Record Financial Results And Claims Its "Superior" LVT Will Fuel Growth ...................................................25

    E.   Defendants' Falsely And Repeatedly Assert That Legitimate Business Practices Explain Their Strong Financial Results ..............31

    F.   Mohawk Touts Its LVT As "Superior," But In Reality Production Flaws Result In Ballooning Inventories Of Unsalable LVT ...................................................................................33

    G.   Mohawk Deceives Investors About The Manufacturing Crisis By Producing *More* LVT ...............................................................41

    H.   Mohawk's Overproduction And Refusal To Write Down Defective Inventories Of LVT And Carpet Result In False And Misleading Financial Statements .......................................................46

    I.   The "Saturday Scheme" Hides Manufacturing And Inventory Crises And Inflates Sales.................................................................48

    J.   Plaintiffs Are Unable To Detect Mohawk's Accounting Deceptions ......................................................................................53

    K.   Mohawk's Frauds Unravel And Mohawk Shares Tank.....................56

VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS.................66

    A.     Pre-Relevant Period – 2016: Full Year and Fourth Quarter ..............67

    B.     2017: First Quarter ........................................................................73

    C.     2017: Second Quarter ...................................................................79

    D.     2017: Third Quarter......................................................................84

    E.     2017: Fourth Quarter and Full Year.............................................91

    F.     2018: First Quarter ......................................................................100

    G.     2018: Second Quarter ..................................................................106

    H.     2018: Third Quarter.....................................................................110

    I.     2018: Fourth Quarter and Full Year.............................................113

VII.    RELIANCE.............................................................................................117

VIII.   LOSS CAUSATION ..............................................................................125

IX.     ADDITIONAL SCIENTER ALLEGATIONS .........................................127

X.      INAPPLICABILITY OF THE STATUTORY SAFE HARBOR.............133

XI.     CAUSES OF ACTION...........................................................................134

XII.    PRAYER FOR RELIEF .........................................................................162

XIII.   JURY TRIAL DEMAND .......................................................................162

Plaintiffs Hound Partners Offshore Fund, LP, Hound Partners Long Master, LP, Hound Partners Concentrated Master, LP, and Blackwell Partners LLC – Series A (together, the "Plaintiffs") make the following allegations based on the investigation conducted by the undersigned counsel, including, but not limited to, analysis of Mohawk Industries, Inc.'s ("Mohawk" or the "Company") filings with the United States Securities and Exchange Commission (the "SEC"); news reports and analyst reports about Mohawk; analyst conference calls and the Company's earnings presentations; court filings in *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc.*, No. 4:20-cv-00005-ELR (N.D. Ga.) (the "Class Action") and *Maverick Fund, Ltd. v. Mohawk Industries, Inc.,* No. 4:21-cv-00118; discussions with percipient witnesses who worked for Mohawk during the relevant time period; and research and analysis of the public record.  In addition, Plaintiffs' claims are based on their direct communications with officers and directors of Mohawk.  Except for allegations specifically concerning or involving Plaintiffs, which are alleged on personal knowledge, Plaintiffs' allegations are based upon information and belief such that Plaintiffs believe additional evidentiary support will be forthcoming in discovery.  Plaintiffs believe that a reasonable opportunity for discovery will provide additional evidentiary support for this claims.

## I.   SUMMARY OF THE ACTION

1.     Plaintiffs bring this action under the Securities Exchange Act of 1934 ("Exchange Act"), Georgia state law, and common law to recover substantial damages Plaintiffs suffered on Mohawk common stock purchased by Plaintiffs between April 28, 2017 and July 25, 2019, inclusive (the "Relevant Period").

2.     This action concerns a fraudulent scheme and racketeering conspiracy by Mohawk, Mohawk's Chief Executive Officer Jeffrey S. Lorberbaum, Mohawk's former Chief Financial Officer Frank H. Boykin, and Mohawk's former President of Flooring North America Brian Carson (together, "Defendants") to misrepresent and conceal the true financial condition of Mohawk's business causing investors, including Plaintiffs, billions in losses.

3.     For years prior to the Relevant Period, Mohawk, the world's largest manufacturer of conventional flooring products such as carpet, tile, stone, and wood, dominated the flooring products industry.  Mohawk achieved record earnings for eleven consecutive quarters in the lead up to early 2017.  During this time period, Mohawk virtually always beat the market's expectations for earnings.  The Company had strong margins that the Company attributed to their investment in equipment that allowed them to create high quality products commanding premium prices.

4.     But in or around 2015, Mohawk was facing a significant change in the flooring industry that threatened Mohawk's dominance in the flooring industry:  the

rise in popularity of luxury vinyl tile (frequently called "LVT").  If LVT's popularity continued to grow, Mohawk either needed to capture that market or risk losing its dominant position in the flooring industry.

5.     To compete in the LVT market, Mohawk acquired an LVT manufacturer with operations in the United States (Dalton, Georgia) and Belgium for $1.2 billion.  Mohawk invested $100 million at the Dalton, Georgia plant (the "Dalton Plant") in an attempt to increase its ability to manufacture LVT.  Mohawk's merger-and-acquisition strategy was in direct contrast to Mohawk's competitors' strategies of acquiring LVT product from suppliers abroad.

6.     Unfortunately, as investors would later learn once Mohawk's fraud was revealed, Mohawk's strategy to compete in the LVT market was a massive failure: Ramp-up was slow, the plant suffered from multiple, fundamental manufacturing failures, employee morale suffered, and by 2017, the Dalton Plant still could not reliably produce usable LVT.  Rather, the LVT it produced was unsightly and defective—it was uneven, it peeled up from the floor, and tiles did not fit together upon installation.  Indeed, more than half of the LVT manufactured at the Dalton Plant was defective and unsalable, and a significant portion of the LVT that Mohawk sold was returned.

7.     Thus, while Mohawk's competitors were gaining market share in the growing LVT market, Mohawk was plagued with LVT manufacturing issues that

eroded relationships with customers and caused Mohawk to lose market share. Making matters worse, Mohawk did not disclose these issues to investors. To the contrary, Defendants repeatedly represented to investors that Mohawk's LVT—like its traditional flooring that had dominated the markets for years—was "superior" to its competitors' products.

8. Further, although accounting rules required Mohawk to write down the value of its defective LVT inventory, during the relevant period Mohawk kept the defective LVT on its books as if it did not have defects. This allowed Mohawk to avoid revealing to the market the significant risks facing Mohawk from its inability to compete in the LVT market. In addition, because writing down the inventory would have resulted in charges against earnings, Mohawk's fraudulent conduct allowed it to artificially inflate its earnings and balance sheet.

9. Mohawk's failure to produce quality LVT not only prevented it from capturing the LVT market, but also resulted in Mohawk losing significant revenues in its traditional business lines because the LVT market was eroding demand in the traditional business lines. Indeed, in 2017, the U.S. market for LVT grew more than 20%, while the entire U.S. flooring market grew by only 4%.

10. Despite these undisclosed struggles, however, Mohawk managed to report strong results to investors. In fact, although the Company's struggles had manifested no later than 2016, Mohawk achieved the highest first quarter in the

Company's history in 2017. Mohawk's *reported* success continued into the remaining quarters of 2017.

11.    The market, including Plaintiffs, was impressed with Mohawk's apparent ability to maintain its dominance despite the changing environment. Mohawk's stock reached an all-time high in late November 2017 following its continued string of seemingly impressive quarters.

12.    Unfortunately for investors, Mohawk's success was a mirage. To conceal the reality that its business was declining, Mohawk began manipulating its financials in several ways in addition to concealing and not writing down its defective LVT product.

13.    *First*, Mohawk—under the direction of its senior management— engaged in a "channel stuffing" revenue recognition scheme (the "Saturday Scheme") whereby, Defendants instructed warehouse workers to load trucks full of unsold inventory for "delivery" on the last Saturday of each quarter to customers whose orders were not for delivery until later quarters.

14.    Despite the fact that the orders were neither ordered for the quarter in which they were shipped, nor accepted for shipment in the quarter in which they were shipped, Mohawk would nonetheless recognize the "sales" as revenue as soon as Mohawk "attempted" to deliver, *i.e.*, as soon as the product was placed on the trucks. This revenue recognition scheme blatantly violated relevant accounting rules

5

and artificially inflated Mohawk's quarterly revenues.  The scheme was deployed by Mohawk for the purpose of meeting financial targets for the given quarter.

15.    In addition to artificially inflating sales, it also left Mohawk in an increasingly difficult position to meet earnings guidance in future quarters because when the trucks set for Saturday delivery came back the following Monday, the returns were recorded on the books for the *next* quarter.  This meant that the Company would start in a hole for the quarter from which sales were pulled forward—and if and when sales declined (or did not continue to grow) it would be impossible for the Company to dig itself out of that hole and mask its channel stuffing scheme.

16.    *Second*, Defendants manipulated Mohawk's earnings and profit margins—both key metrics that were followed by investors including Plaintiffs—by producing excessive quantities of (defective) LVT and carpet products that it knew it would not and could not sell because it far exceeded customer demand.  By producing excess inventory, Mohawk lowered its per-unit cost, which artificially increased its margins and earnings.

17.    Not only did the overproduction manipulate Mohawk's financials, it also harmed Mohawk's long-term health.  The overproduction of LVT resulted in Mohawk having even more defective LVT on hand.  Storing that defective LVT was costly.  Similarly, the overproduced carpet was costly to store and became unusable

when stored for extended periods of time, as was needed given the amount of overproduction. And despite the excess carpet inventory being rendered defective by the prolonged storage periods, Mohawk continued to reflect that inventory (as well as the defective LVT) at full value rather than writing it down as required by the accounting rules.

18.     As a result of Defendants' undisclosed manipulations, including its intentional overproduction of product and its refusal to write down defective LVT product and carpet, the Company's reported inventory figures grew and its turnover (the speed at which it sells through its inventory) slowed. To avoid the market learning the true reasons for these trends, Defendants offered numerous benign but false explanations, including geographic expansions, new-product ramp up, and rising material costs. Although these false explanations succeeded initially in preventing the market from learning the truth regarding Defendants' schemes, the truth regarding Mohawk's business finally began to come to light in July 2018.

19.     On July 25, 2018, Mohawk disclosed that it missed earnings guidance and analysts' consensus estimate for the second quarter of 2018 because of "lower sales than [they] anticipated." Mohawk further disclosed that the Company had significant excess inventory, which forced the Company to "produce[] less than [it] sold to reduce inventory." The excess inventory is unsurprising given the then-unknown reality that Mohawk had been manufacturing carpet and LVT in excess of

7

demand in order to artificially increase the Company's margins and earnings. Defendants further admitted that the Company has experienced "a lower production rate" and "new product inefficiencies."

20.    Upon this partial materialization of Mohawk's misconduct, Mohawk's stock fell approximately $38 per share to close at $179 per share, a decline of more than 18% from the prior day's close of $217 per share.

21.    The market reacted negatively to the news.  For example, one market analyst noted that there appeared to be "a disconnect between [Mohawk's] financial models and what is really happening in the business" and that a review of Mohawk's financials "suggests a very long trend of stretching a little bit more each quarter to meet numbers."

22.    Rather than come clean and confirm the schemes Defendants had utilized to stretch their numbers to meet earnings, Defendants suggested the issues were transitory.  Indeed, Mohawk continued their false claim that part of the issue was capacity constraints in the LVT business where they continued to "ramp[] up" and assured investors that the ramp up would allow for sales growth going forward. These false explanations had their intended result of helping assuage concerns in the market.  Certain market analysts referred to the issues as "transitory" and noted that—based on Mohawk's representations—it appears Mohawk was "[w]ell positioned to capitalize on growth in LVT."

8

23.    Of course, as the market would later learn, these issues were not transitory.  Instead, Defendants had built a house of cards that was being propped up by the fraudulent schemes.  Indeed, the fraudulent scheme and accounting gimmicks were so pervasive that at least one former Mohawk employee—a sales representative with two decades of experience at the Company and direct knowledge regarding the defective LVT product—described Mohawk as having the "Enron scandal written all over it."

24.    The very next quarter, Q3 2018, Mohawk again reported disappointing results due to the materialization of the previously undisclosed issues plaguing the Company.  Specifically, on October 26, 2018, Mohawk announced that "[s]ales growth in all segments was lower than estimates," "additional manufacturing reductions were required during the [quarter] to control inventory," and the Company was struggling to produce LVT product due to "physical mechanical failures" and "software problems."

25.    As the Company acknowledged, these issues resulted in the Company's margins falling significantly to single digits in the Flooring North America segment. These ongoing issues also forced Defendants to reduce guidance going forward.

26.    In response to this surprising and disappointing news, Mohawk's stock fell 24% to $115.03 per share from the prior day's close of $151.07 per share.

Market analysts were also shocked and noted that "calling [the quarter] a disaster is being kind."

27.    Although Defendants continued to insist that these issues were "temporary"—they were not—by July 2019 Mohawk, once again, announced terrible quarterly results.  Mohawk again admitted that it had excess inventory issues that required "taking actions" and that continued "excess inventories" required the Company to lower its guidance going forward.  These final revelations resulted in Mohawk's stock falling an additional 18%.

28.    As set forth herein, Mohawk and its senior management engaged in a coordinated fraudulent scheme to artificially inflate the value of Mohawk's securities over a multi-year period.  Over the course of several partial corrective disclosures starting in July 2018, Mohawk's stock price dropped substantially and investors lost billions of dollars.

29.    As a result of Defendants' misleading statements and omissions and the subsequent decline in Mohawk's stock price following the partial corrective disclosures, Plaintiffs suffered substantial economic losses.

## II.    JURISDICTION AND VENUE

30.    This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337, and 1367.

31.     This Court has personal jurisdiction over Defendants, as all Defendants are residents of the United States and/or have minimum contacts with this District.

32.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b), (c), and (d).

33.     Defendants transact business in this District.   Substantial acts in furtherance of the wrongs alleged and/or their effects have occurred within this District.

34.     In connection with the acts and omissions alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the national securities markets.

## III.    THE PARTIES

### A.     Plaintiffs

35.     Plaintiff Hound Partners Offshore Fund, LP is a Cayman limited partnership.   Hound Partners Offshore Fund, LP's general partner is Hound Performance, LLC, whose managing member is an individual residing in New York. Hound Partners Offshore Fund, LP is managed by Hound Partners LLC primarily out of Hound Partners LLC's New York office.

36.     Plaintiff Hound Partners Long Master, LP is a Cayman limited partnership.   Hound Partners Long Master, LP's general partner is Hound

11

Performance, LLC, whose managing member is an individual residing in New York. Hound Partners Long Master, LP is managed by Hound Partners LLC primarily out of Hound Partners LLC's New York office.

37.    Plaintiff Hound Partners Concentrated Master, LP is a Cayman limited partnership.  Hound Partners Concentrated Master, LP's general partner is Hound Performance, LLC, whose managing member is an individual residing in New York. Hound Partners Concentrated Master, LP is primarily managed by Hound Partners LLC out of Hound Partners LLC's New York office.

38.    Plaintiff Blackwell Partners LLC – Series A (the succeeding entity to Blackwell Partners LLC) ("Blackwell") is an investment entity.   Blackwell maintained a separately managed account with Hound Partners LLC, which was primarily managed by Hound Partners LLC out of Hound Partners LLC's New York Office.  Hound Partners LLC acted as investment management on behalf of Plaintiff Blackwell, and had full discretion in making investment decisions on behalf of Blackwell regarding Mohawk.

## B.    Defendants

39.  Defendant Mohawk is a manufacturer of floor covering products, including carpet, rugs, hardwood flooring, laminates, sheet laminates, tile, and ceramic.  Mohawk sells its flooring products to distributors, wholesalers, and retailers, including big-box stores like Sherwin Williams and Floor & Decor.

Mohawk's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "MHK."

40.   Defendant Jeffrey S. Lorberbaum ("Lorberbaum") is Mohawk's Chief\ Executive Officer, a position he has held since January 2001.  Lorberbaum is also the Chairman of Mohawk's Board of Directors, a position he has held since May 2004.  Defendant Lorberbaum signed and certified the purported accuracy of Mohawk's quarterly and annual SEC filings throughout the relevant period.  Further, throughout the period in which Plaintiffs researched their investment in Mohawk, Lorberbaum regularly spoke to investors and securities analysts regarding Mohawk, the Company's products, and its financial results.  During the Relevant Period, Plaintiffs' investment manager, Hound Partners LLC, spoke directly with Lorberbaum during which time Lorberbaum made material misrepresentations and omissions directly to Plaintiffs.

41.   Defendant Frank H. Boykin ("Boykin") was Mohawk's Chief Financial Officer from January 2005 through April 2019.  Defendant Boykin signed and certified the purported accuracy of Mohawk's quarterly and annual SEC filings throughout the relevant period.  Further, throughout the period in which Plaintiffs researched their investment in Mohawk, Boykin regularly spoke to investors and securities analysts regarding Mohawk, the Company's products, and its financial results.   During the relevant period, Plaintiffs' investment manager, Hound

Partners LLC, spoke directly with Boykin during which time Boykin made material misrepresentations and omissions directly to Plaintiffs.

42.   Defendant Brian Carson ("Carson," and together with Lorberbaum and Boykin, the "Individual Defendants") was Mohawk's President of Flooring North America from July 2011 until he was fired on November 12, 2018.  As Carson has publicly stated, including on his personal LinkedIn profile, he had "Full P&L [profit and loss] ownership" over Mohawk's North American business in his role as President of Flooring North America.   He oversaw all of Mohawk's "42 plants, 41 distribution centers, and nine segment sales forces" in North America. Carson managed the Flooring North America segment of Mohawk (Mohawk's largest division) and was a member of Mohawk's world-wide leadership team. Mohawk described Carson in its public filings with the SEC as "an 'executive employee' and a 'key employee,' as those terms are defined in O.C.G.A. 13-8-51," and that he "regularly solicited customers for Mohawk, engaged in sales activities for Mohawk, and managed the Flooring North America Business Unit of Mohawk, while also participating on Mohawk's world-wide leadership team."

43.  Carson personally orchestrated (in concert with Lorberbaum and Boykin) and was directly involved in the fraudulent schemes, including (i) the concealment of the problems with the Company's production of LVT; (ii) manipulating Mohawk's inventory levels by producing excess (defective) LVT and

carpeting and then holding such excess product as inventory for prolonged periods of time, without writing down the value of that defective LVT and carpet as required; and (iii) the implementation and execution of the Saturday Scheme.

44. Carson, as the former President of the North America Flooring segment during the relevant period, was responsible for and furnished false and misleading information to the Company concerning the North America Flooring segment for inclusion in public press releases, SEC filings, analyst conference calls and other disclosures to investors, which information was reported to investors (including Plaintiffs) and, foreseeably, relied upon by those investors in making investment decisions to their detriment.

45. During the relevant period, the Individual Defendants and other Mohawk senior executive officers had access to and were aware of material adverse non-public information concerning Mohawk, as confirmed by numerous confidential witnesses as described herein.  More specifically, the Individual Defendants and other Mohawk senior executive officers had access to non-public information about Mohawk's business, financial condition, products, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them.

46.   As set forth in more detail below, given their possession of such information, the Individual Defendants and other Mohawk senior executive officers knew or recklessly disregarded that the adverse facts alleged herein had been misrepresented and/or had not been disclosed to, and were being concealed from, the investing public.

## IV.   NUMEROUS CONFIDENTIAL WITNESSES HAVE CONFIRMED THAT MOHAWK AND ITS EXECUTIVES WERE ENGAGED IN A LONG-RUNNING FRAUD

47.   Through their undersigned counsel, Plaintiffs have conducted a reasonable and good faith inquiry under the circumstances.

48.   On June 29, 2020, Lead Plaintiff in the Class Action filed its Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Class Action Complaint").  Separately, on June 22, 2021, the Maverick Fund, Ltd. ("Maverick") and others filed a separate Complaint for Violations of the Federal Securities Laws and State Law (the "Maverick Complaint").

49.   Per those complaints, counsel for the plaintiffs in the Class Complaint ("Class counsel") and counsel for the plaintiffs in the Maverick Complaint ("Maverick counsel") conducted extensive investigations into misconduct at Mohawk.  Both Class counsel and Maverick counsel interviewed former Mohawk employees.

50. Plaintiffs in the instant case have reviewed the factual investigation conducted by Class counsel and Maverick counsel as set forth in the complaints.

51. In addition, Plaintiffs' counsel's investigation included working with a private investigator who spoke with former employees of Mohawk.

52. Plaintiffs' counsel reviewed the Class Action Complaint and the Maverick Complaint, which corroborates Plaintiffs' counsels' investigation and the information received from the Confidential Witnesses.

53. Upon information and belief, several of the former employees and confidential witnesses have become unwilling to speak more about Mohawk's misconduct because of (1) coercive pressure from Mohawk to silence its former employees whose testimony may lead to liability for Mohawk, and (2) concern about criminal liability in light of ongoing investigations into Mohawk's wrongdoing by the U.S. Department of Justice and the U.S. Securities and Exchange Commission.

54. For example, as explained in the Maverick Complaint (¶38), the former Mohawk employee identified as FE8 in the Class Action Complaint was contacted by Mohawk's attorneys and, according to FE8, encouraged to recant his statements to Class counsel regarding Defendants' misconduct. According to FE8, Mohawk's attorneys were trying to intimidate him.

55.   By way of further example, as set forth in the Maverick Complaint (¶¶ 42-43), FE11 from the Class Complaint was contacted by the FBI/DOJ in connection with their investigation into Mohawk's wrongdoing and was no longer willing to provide further information absent formal discovery.  In light of the above, Plaintiffs incorporate herein the allegations attributable to FE11 in the Class Complaint .  Based on Plaintiffs' counsel's investigation, Plaintiffs have a good faith basis to believe that the allegations in the Class Complaint attributable to FE11 are well-pled.

56.   The former employees, all of whom had first-hand knowledge of various aspects of the fraudulent schemes, are referred to herein with the abbreviation "CW" (for Confidential Witness) and a number.

## V.     FACTUAL BACKGROUND

### A.     Mohawk's Business

57.   Mohawk is the world's largest manufacturer and distributor of flooring products, and historically dominated the market for conventional flooring products—e.g., wood, stone, tile, ceramics, laminate, and carpet (collectively, "Conventional Flooring Products").  Mohawk develops, distributes, and markets its products to independent distributors, retailers, building contractors, and home centers like Home Depot and Sherwin Williams.  Mohawk's products ship from Mohawk distribution centers on Mohawk-operated trucks.

58.  Prior to the Relevant Period, Mohawk had been a rapidly expanding powerhouse in the worldwide flooring markets for nearly two decades.  In 2000, Mohawk predominantly sold soft floor coverings, with carpets making up about 95% of its revenue.  By 2014, Mohawk grew to become a $7.8 billion business, with less than half of that from carpet.  By 2016, Mohawk ranked second in the industry in market share for carpets, first in ceramic and stone, and first in laminates, all of which made it the dominant seller of Conventional Flooring Products.

59.  Investors expected Mohawk to use its dominance to capture significant upswings in future demand for flooring products.  And Mohawk assured investors that it was primed to meet these expectations, which it did.  By the end of 2016, Mohawk's annual revenues rose to an all-time high of $9 billion and the Company recorded record-high earnings.  Further, Mohawk's operating margins for the fourth quarter of 2016 were the "highest fourth-quarter results in the Company's history."

60.  Defendants attributed its success to the "aggressive growth strategy [it] began in 2013."  The engine of that apparent growth was Mohawk's Flooring North America Segment ("Flooring North America" or "Flooring NA"), which includes Conventional Flooring Products and LVT sold in the United States and was

responsible for 45% of Mohawk's earnings in 2015 and 46% of Mohawk's earnings in 2016.

61.   Mohawk's apparent success impressed investors and market analysts alike.  Virtually all market analysts had a positive view of Mohawk.  For example, on February 26, 2016, RBC Capital wrote in an analyst report that Mohawk "remains one of our top investment ideas because of the company's consistent ability to deliver sustained earnings growth."  In early 2017, Evercore ISI published an analyst report that stated that Mohawk "is the emerging growth story in the sector" as evidenced by Mohawk "exceed[ing] consensus [forecasts] in 20 of the last 21 quarters."  As part of its due diligence in connection with their Mohawk investments, Plaintiffs similarly recognized that Mohawk had "consistently beaten" the Company's own guidance as well as "street estimates."  Hound also noted that market analysts were similarly "generally bullish with 15 buy[] [recommendations], 4 hold[] [recommendations], and 0 sell[] recommendations."

62.   Investors rewarded Mohawk for its continued ability to report record sales and earnings growth.  The Company's stock rose from just over $100 per share at the beginning of 2013 to over $230 per share at the start of the Relevant Period in early 2017.  And Defendants made it clear that investors should expect the same going forward.  Indeed, on Mohawk's earning's call at the start of 2017, Lorberbaum stated unequivocally that "Mohawk is in the best position in the

Company's history" and told investors and market analysts to expect Mohawk's "2017 sales [to] grow similarly to last year."

### B. LVT's Growth As An Alternative To Conventional Flooring Products Threatens Conventional Flooring Products

63. As noted above, leading up to the Relevant Period, Mohawk's business reported strong operational results, including record revenues and earnings. However, at the same time that Mohawk was reporting record results, LVT was growing in popularity.

64. In 2006, the resilient flooring category, only 5% of which was LVT sales, was a $1.9 billion market that captured only 7.5% of the total U.S. flooring market. Nearly 80% of it was manufactured in the United States. By 2016, as a result of growing demand for LVT, the resilient category surged to a $3.2 billion market, capturing 14.2% of the total U.S. flooring market, with 59% of the category's sales from LVT.

65. Mohawk recognized the growing market for LVT. In a January 2015 press release, Mohawk stated that "[i]n the U.S., LVT now represents about 5% of the total flooring market, and sales are projected to grow more than 15% annually through the end of the decade." By 2017, LVT helped make resilient flooring the largest hard surface flooring category in the U.S. While demand was soaring, LVT was increasingly produced overseas, with domestic production dropping to 41%.

Mohawk's competitors, including Shaw and Armstrong, established reliable and cost-effective LVT manufacturing sources from international suppliers.

66.  The increasing popularity of LVT posed a competitive risk for Mohawk, which had dominated the Conventional Flooring Products market. Simply put, if demand for LVT continued to grow, it could cannibalize Mohawk's sales in the Conventional Flooring Products market.  It was therefore critical that Mohawk capture the LVT market, as it had the Conventional Flooring Products market, in order to maintain market dominance.

### C.    Mohawk Purchases An LVT Manufacturer

67.  To meet the demand for LVT, and provide Mohawk with a strategic advantage over its competitors who were importing LVT from overseas, Mohawk spent $1.2 billion in 2015 to purchase IVC Group ("IVC"), an LVT manufacturer with an LVT plant in Belgium and another LVT plant in the United States in Dalton, Georgia.  Lorberbaum boasted that "[IVC's] new LVT plant in Dalton, Ga. will be one of the world's largest, most efficient production lines with leading technology and will position us to meet the rapidly growing U.S. market."

68.  When Mohawk's acquisition of IVC was announced, Carson said in a June 17, 2015 interview on FloorDaily.net that Mohawk would bring its superior distribution channel and "logistics capabilities" to bolster IVC's LVT manufacturing expertise.  Carson championed the synergies that could be achieved

through the "vertical integration" of IVC's superior manufacturing capabilities and Mohawk's world class distribution.  Defendants presented the IVC acquisition as Mohawk's silver bullet for dominating the LVT market as it had the Conventional Flooring Products market for so long.

69.   Carson continued to tout the Company's purported LVT production capabilities publicly.  For example, in an April 21, 2016 interview, Carson stated that the "Dalton LVT plant … will be operating at full capacity by the end of 2016." He added that "[t]his major investment to expand our U.S. LVT production will meet increased demand for our unique products and enhance Mohawk's position as the global leader in LVT, the world's fastest growing flooring category."

70.   By the end of 2016, Carson summarized Mohawk's purported progress in meeting these goals, telling Floor Covering Weekly, "I'm extremely pleased with the progress our resilient team has made.  Since the acquisition in mid-2015, we have completed a state-of-the-art, fully integrated LVT plant, and we have broken ground on a new facility that will make both rigid and flexible LVT."

71.   Similarly, Lorberbaum told investors during conference calls that the Company's U.S. LVT Plant would "be one of the world's largest, most efficient production lines" and would enable the Company to "take some share from the Chinese [imports]."  Defendants' statements could not have been more inaccurate.

72.   Despite Defendants' public statements, Mohawk began falling further behind its competitors, who had aggressively sourced cost-efficient LVT.  Shaw, for example—which had zero market share before entering the LVT market at the end of 2015—rose to the top spot in 2017, capturing almost 30% of U.S. LVT sales. Armstrong, whose size pales in comparison to Mohawk and Shaw, had grabbed over 13% of domestic LVT sales.  Mohawk meanwhile captured only 12% of LVT sales.

73.   Mohawk blamed its lack of dominance within the LVT market on a lack of production capacity.  For example, on a November 4, 2016 earnings call, Lorberbaum stated that Mohawk was "constrained by our present capacities" in LVT and Mohawk was actually "currently selling all of our LVT we are manufacturing, even as we continue to increase our production capacity."

74.   The market believed Defendants' explanation.   For example, on November 7, 2016 Gabelli & Co. published an analyst report that stated Mohawk was "selling everything they produce" in the LVT market.  Similarly, Barclays published an analyst report that predicted "positive revenue and earnings revisions over the next two years as it becomes clear that [Mohawk] is successfully ramping the new capacity."

### D.   Mohawk Reports Record Financial Results And Claims Its "Superior" LVT Will Fuel Growth

75.   Following Mohawk's exceptional performance in 2016, analysts questioned whether Mohawk could continue its impressive growth story.  For example, MKM Partners wrote in an April 13, 2017 report that, while "Mohawk remains one of our favorite stocks," "the biggest focus" will be whether Mohawk's 2016 "momentum in topline growth [is] sustainable into early 2017."

76.   Mohawk silenced any doubters on April 28, 2017, the beginning of the Relevant Period, when it announced record sales for Q1 2017 earnings. Lorberbaum boasted to investors that Company-wide quarterly net sales had topped $2.2 billion, a "first quarter record" that represented an increase of "approximately 4%" over the prior year's first quarter (itself a record).  Defendants pointed to the Flooring North America segment as a significant driver of these record sales.  Lorberbaum highlighted how Flooring North America's sales—which already accounted for more than 40% of Mohawk's overall business—were "outpacing" the growth of all other segments.  Lorberbaum trumpeted that sales from the "Flooring North America segment increased 4%" from the prior year's first quarter.

77.   The next quarter, Q2 2017, Mohawk appeared to have delivered again, reporting "an all-time new record" for Company-wide quarterly sales. Lorberbaum announced that "Mohawk's performance continued at a record level, generating

the highest sales … in the company's history," "with sales growth of 6%" to a remarkable $2.45 billion for the second quarter of 2017.  Lorberbaum once again announced that the Flooring North America segment also grew 6%, rising to $1.04 billion in net sales for the second quarter.

78.   Mohawk continued these supposedly record-breaking results throughout the rest of the year, as the Company reported high single digit net sales growth each quarter of 2017.  Defendants reported that Mohawk's results set a new quarterly "record" every single quarter of 2017, as "revenues rose to an all-time high of $9.5 billion" for the full year of 2017, "a 6% increase" over the prior year. The Company similarly highlighted that Flooring North America revenues continued apace as well, growing each quarter during 2017 and expanding to support approximately 42% of the Company's overall record sales figures.

79.   These purportedly "record" setting quarters were necessary to meet market analysts' earnings guidance.  For example, during the first quarter of 2017, as a result of its first quarter "record sales," Mohawk reported earnings per share (EPS) of $2.72—the precise consensus EPS forecasted by analysts.  During the third quarter of 2017, Mohawk's record sales enabled it to record an EPS of $3.75, which beat consensus expectations by a mere penny.  And in the second and fourth quarters of 2017, Mohawk edged out the consensus EPS expectations by roughly a dime in each quarter.

80.   The purportedly "record" quarters were also necessary to meet market analysts' revenue expectations.  For example, during the second quarter of 2017, Mohawk reported revenues of $2.453 billion, which beat consensus expectations by one-fifth of one percent (i.e., $4.8 million); during the fourth quarter of 2017, Mohawk reported revenues of $2.369 billion, which beat consensus expectations by just less than one-fifth of one percent (i.e., $4.6 million).

81.   In addition to reporting record sales and earnings, Mohawk also reported record margins, which is a metric that investors, like Plaintiffs, focused on when analyzing Mohawk's financial performance.  A company's margins measures how efficiently a company is managing its business.  In short, it measures how much a company makes in bottom-line earnings as a percentage of its revenue. Companies with higher margins than their competitors are generally viewed more favorably than their competitors because more of their sales translates into bottom-line profit.  Indeed, during the Relevant Period, Plaintiffs and market analysts regularly analyzed Mohawk's purported margins.

82.   Given the market's focus on margins, it is unsurprising that Defendants repeatedly touted the Company's "increasing margins" and reported "record" margins throughout the Relevant Period.  For example, in a press release issued after the market closed on April 27, 2017, Lorberbaum told investors that "[o]ur operating margin for the quarter rose to 12.4%, a 110 basis point improvement over

27

the prior year and the highest first quarter result in the company's history."  And the same day, Lorberbaum stated that "[b]oth our operating income and margin were first quarter records."  In the next quarter, on July 28, 2017, Defendants again touted that Mohawk's operating margin "was up 60 basis points over last year."

83.  Defendants represented that these margin improvements were driven by legitimate business practices and products sold under the Flooring North America segment.  For example, on April 28, 2017, Lorberbaum stated that "[t]he continued improvement of our LVT manufacturing process is increasing our capacity and margins."  Again, on October 27, 2017, Lorberbaum represented to investors that "[o]ur new product introductions improved our average selling prices and margins, and our process innovations and investments in manufacturing technology improved our cost."

84.  The strong margins, particularly those for Flooring North America, were viewed positively by investors.  For example, Hound internally noted that Mohawk was a strong investment opportunity because it "earns sustainably outsized margins and ROICs because of its competitive advantages throughout the value chain," such as the Company's "vertical integration," and "product innovation," both factors Defendants represented were the cause of Mohawk's strong margins.

85. Defendants were similarly assuring investors that Mohawk was well-situated for the future of flooring and would capture significant market share as LVT grew in popularity because of Mohawk's LVT products' "*superior design and performance*." The Company claimed its "flexible, rigid and commercial LVT collections" were "being well accepted across all channels of the market." Defendants similarly claimed that LVT sales were growing "as a result of our *leading design and performance* attributes."

86. According to Defendants, Mohawk was "in the best position by having the lowest cost and largest capacity in the U.S." to meet the growing LVT market.

87. Notably, Defendants told investors that its record results would be even better if it weren't for the fact that the Company had "capacity constraints."

88. For example, during an investor call on April 28, 2017, Lorberbaum said that as "we've discussed over multiple calls, many of our production facilities are running at or near capacity." Lorberbaum further represented that "[w]e have said that [in] some of our product categories we've been limited by capacity." And in a press release issued after the market closed on October 27, 2017, Lorberbaum reiterated that Defendants "expect[ed] higher sales with the relief of some of our capacity constraints, enabling us to expand our market position." And, in response to a question during the Company's third quarter 2017 earnings call, Lorberbaum stated that "we have sold all of the laminate that we could make without putting in

new capacity, which is just getting started up …. With LVT, we increased the capacity of our LVT through productivity initiatives, so we were selling all of it we could have."

89.   In other words, according to Defendants, the Company was selling all of the product it was producing, which, if true, would make Mohawk's earnings even more impressive since its sales, earnings, and margins would all improve as the Company's capacity grew.   Indeed, market analysts drew that precise conclusion.   For example, in an analyst report Gabelli & Co. highlighted that "capacity investments should help generate" additional sales and that "[a]s new capacity comes on line, MHK is well positioned to continue to achieve high levels of organic growth and drive further margin expansion."

90.   Both investors and market analysts applauded these record-setting quarters and Mohawk's ability to continue to meet and exceed market expectations. By the end of 2017, Mohawk's stock traded above $275 per share.

91.   Into 2018 Defendants continued to attribute LVT sales volumes to short term capacity constraints.   For instance, COO Chris Wellborn told investors that, in the first quarter of 2018, "LVT was constrained," and "new production will increase sales."   The next quarter, CFO Frank Boykin told investors that the same problem persisted: "During [the second quarter of 2018], our U.S. LVT sales growth was limited by capacity constraints."   And in the third quarter, Defendant

Lorberbaum continued to insist that the only reason LVT sales were not stronger was because the Dalton Plant could not make enough product to meet customers' seemingly insatiable demand: "*we have sold all of the laminate that we could make without putting in new capacity, which is just getting started up . . . . With LVT . . . we were selling all of it we could have*."

### E.    Defendants' Falsely And Repeatedly Assert That Legitimate Business Practices Explain Their Strong Financial Results

92.    Throughout the Relevant Period, Defendants' assured investors that it achieved its "record sales" and "record margins" through legitimate and proper means, and that its struggles with LVT sales were temporary and the result of capacity constraints.  These statements were false.  Defendants' numerous material misrepresentations are detailed below, Section VI, but a few illustrative examples are provided here.

93.    Defendants continuously claimed that they were "doing the right things to make the business grow" and that they were using "the same strategy [they had] been using" to provide results over the previous five years.  Similarly, for the full year of 2017, Lorberbaum attributed Mohawk's record results to "the unique strategy that combined the best features of a large, well-run public company, a private acquisition firm and a venture capital group."

94.    Defendant Lorberbaum doubled down on these assurances during the Relevant Period, stating during Mohawk's earning call for the third quarter of 2017

that Mohawk's success had been, and would continue to be, reliable and sustainable.  Looking into 2018, Lorberbaum reminded investors that Mohawk, and specifically he and his executive team, had "a long history of outperforming the market," with a "growth rate for sales of 9%."  He reiterated that Mohawk's "strong management and balance sheet" would ensure that Mohawk would continue to grow and outperform the market.

95.  Defendants buttressed these statements with repeated, specific representations that traditional business acumen drove Mohawk's continuous revenue growth and margin improvement in its Flooring North America segment.  In each quarterly report filed with the SEC, Defendants told the market that Mohawk's increase in net sales in the Flooring North America segment was primarily attributable to "higher sales volume" and "the favorable net impact of price and product mix," leading investors to believe that Mohawk achieved its financial success through Defendants' ability to sell more of the right products at the right price.

96.  Defendants were similarly assuring investors that Mohawk was well-situated for the future of flooring – and would capture significant market share as LVT grew in popularity.  Defendants told investors of Mohawk's LVT products: "With their superior design and performance, our flexible, rigid and commercial LVT collections are being well accepted across all channels of the market."

According to Defendants, Mohawk was "in the best position by having the lowest cost and largest capacity in the U.S." to meet the growing LVT market.

97.   Defendants did not disclose that, in contrast to the legitimate means Defendants attributed for their success, Defendants were actually engaged in a fraudulent scheme designed to meet analysts' consensus forecasts, pulling forward potential sales from future periods to make quarterly estimates, unable to produce marketable LVT, refusing to write-down defective and unsellable inventory, and otherwise hiding the Company's problems and true financial condition—as set forth below.

98.   Ironically, despite Defendants' manipulations of Mohawk's financial results, described below, Defendants claimed the Company had achieved its "record" financial results by focusing on the long-term:  "While some public companies focus on meeting quarterly expectations or maximizing results in a given year, we focus on building a company that will last forever."

### F.   Mohawk Touts Its LVT As "Superior," But In Reality Production Flaws Result In Ballooning Inventories Of Unsalable LVT

99.   Although Mohawk continually represented that it was well-positioned to capture the LVT market due to its "superior" product, the truth was far different. Indeed, in stark contrast to the "superior" product being touted to investors, Mohawk was unable to produce LVT product that was even sellable.

100. For example, according to CW1, a VP on National Accounts and VP of E- Commerce at Mohawk from March 2014 through October 2019, it was widely known within Mohawk that the Company's U.S. LVT flooring production was defective.  According to CW1:  "We could not make a first quality product."

101. CW1's account is corroborated by the allegations attributed to FE11 in the Class Complaint.  According to FE11, the Senior Vice President of Product Development at Mohawk from January 2017 to March 2019, Mohawk's LVT production lines in Dalton had serious flaws.  FE11 arrived shortly after Mohawk acquired IVC and the IVC Dalton plant; when he first saw the state of the production lines, he recalled: "I was aghast.  I thought what am I getting myself into?  This is a nightmare."

102. FE11 further explained that, beginning when FE11 arrived at the Company in January 2017 until FE11 departed in March 2019, the press at the Dalton LVT plant suffered from gauge issues that caused inconsistency in the thickness of LVT that it produced.  Moreover, the Dalton LVT plant could not produce a functional locking mechanism by which individual LVT pieces could snap, and stay snapped, together during installation.  The result was a useless product: (1) there were unsightly height differences among LVT pieces that were supposed to be a uniform height, and (2) the LVT pieces would come apart from one another after installation.

103. Though the production issues and product defects were never disclosed to investors, the flaws at the Dalton Plant were well known within Mohawk, including within upper management. According to CW1, Mohawk management assembled a "G3 Team" that met weekly with the purpose of analyzing why LVT sales were so slow and to assess ways to fix the manufacturing process.

104. Mohawk sold the faulty LVT anyway. CW2, a sales representative for Mohawk from April 1998 to February 2018, personally sold hundreds of thousands of square feet of the defective LVT in 2017 to unsuspecting customers. According to CW2, by mid-2017 Mohawk had millions of square feet of defective LVT flooring and the Company was slashing prices on the LVT to sell it—without disclosing the defects to purchasers.

105. CW2 recalled that one customer, the True Value store located in Granada, Mississippi, purchased Mohawk's defective LVT and then sold and installed approximately 4,000 square feet of the product in a women's dress shop located in the same town. Within two months of installation, the problems with the LVT became apparent as the flooring pieces would not stay together and were coming apart. As part of Mohawk's procedures, CW2 visited the dress shop where the LVT flooring had been installed and documented the problems. CW2 filed a claim on behalf of the customer, which went up the Mohawk management chain of command. Although Mohawk initially refused the claim, CW2 explained that after

35

an attorney on behalf of the dress shop contacted Mohawk and threatened legal action, Mohawk agreed to pay for the claim, including labor charges.

106. CW2's dissatisfaction with this practice led him to quit Mohawk in February 2018 after nearly 20 years working at the Company.

107. CW3, who worked as an account manager at Mohawk from March 2016 until May 2018, corroborated this account. CW3 explained that although Mohawk represented that its LVT was "first quality," half or more of the LVT that Mohawk produced was unsellable. CW3 recalled that many customers who received the LVT were unhappy with the product, and that it hurt Mohawk's relationships with those customers. CW3 recalled that Mohawk lost business with a broad cross-section of customers over the defective LVT.

108. Among Mohawk's unhappy customers was Home Depot—a major buyer and distributor of LVT. CW1 participated in quarterly business review meetings with Home Depot from 2017 through 2019 at Mohawk's offices, during which Mohawk's LVT issues were a key point of contention. Home Depot representatives at the meetings were frustrated that Mohawk could not fulfill LVT flooring orders and that frequent promises to improve Mohawk's LVT product were broken. CW1 said the faulty product Mohawk produced was the "elephant in the room" at these meetings, because both Home Depot and Mohawk leadership knew that Mohawk was not able to make high quality LVT.

109. Eventually, big box stores like Home Depot stopped accepting Mohawk's LVT.  According to CW7, a Supply Chain Director from March 2019 until December 2019, the defective LVT had to be removed from boxes labeled Home Depot and Lowe's before being delivered to smaller distributors and retailers, which further increased the cost of disposing of the defective LVT.

110. Management at Mohawk—including the individual defendants—were well aware of the flaws in the product.  *First*, according to CW1, Mohawk's executives observed the defects firsthand when Mohawk installed its Dalton-manufactured LVT product in its corporate headquarters.  The defects were apparent—the LVT would not lay flat and peeled back up.  Defendants stepped over their own flawed product on their way into the office every morning.

111. *Second*, in January 2017, shortly after joining Mohawk, FE11 attended a Surfaces Trade Show with Defendant Carson and Senior Vice President of distribution, Paul Murfin.  During the trade show, Carson stated to Murfin that he was getting reports from the field that "the dogs don't like the dog food we're making."  FE11 explained to Carson that Mohawk was competing against products that were far superior to the products Mohawk was selling.

112. *Third*, CW2 stated that in 2017, Defendant Lorberbaum had approved slashing prices for the "first rate" LVT from the $2.50 per square foot to $0.99 per

square foot, which CW2 called an "unheard of deal" that would not have been done but for the defects.

113. CW7, a Mohawk Supply Chain Director from March 2019 until December 2019, corroborated the price cuts, stating that by 2019, Mohawk was forced into "selling [the defective LVT] for pennies on the dollar by the truckload." CW7 recalls product that Mohawk should have normally sold for $2.00 per square foot being sold for $0.42 per square foot. CW7 also recalled that week after week the Company's leadership would discuss different tactics in an attempt to improve the quality of LVT produced by the Dalton LVT plant, but the quality still suffered.

114. *Fourth*, many in the executive suite at Mohawk understood the success of Mohawk to be tied to the success of the Dalton LVT plant. According to CW5, the CIO for Mohawk Industries' Flooring Division from April 2014 until August 2017, the problems at the Dalton LVT plant were well known around the company. According to CW5, there "were issues with quality and there was a lot of pressure to fix it." Moreover, CW5 noted: "I know there was a lot of money thrown into the plant, but I don't think they got the quality up to where they needed it to be." CW5 knew this because the problems with the LVT were discussed in monthly business review meetings, which CW5 (along with other company leadership and executives) attended. In these business review meetings, all business units

presented overall numbers and reports, including reports from the LVT plant that showed scrap numbers going up.

115. Around March or April 2018, human resources executives sent CW4, an Organization Learning Specialist and Manager of Organizational Development in the Human Resources Department, to diagnose the cause of the problems at the Dalton LVT plant, including low morale and high employee turnover.

116. CW4 found that nobody knew how to fix the problems with the Dalton LVT plant's production lines.  According to CW4, the machinery was constantly failing, computer systems were going down, and production quality did not meet expected standards.  As just one example of the dysfunction, CW4 explained that some of the machinery at the Dalton LVT plant came from China and the instructions for putting together the machinery was in Chinese.  No one knew how to read Chinese and the equipment was put together incorrectly.

117. Upper management knew this and put pressure on plant managers, who in turn pressured their low-level employees to improve the quality of the product they manufactured.  Employees complained of unreasonable pressure from management and unfair expectations to work overtime causing safety concerns to deal with issues at the Dalton plant.  The work environment was toxic, and employee turnover was unusually high.

118. The volume of unusable product was staggering, or, in the words of CW4, "huge." CW4 noted that the LVT production problems were well known throughout the Company, including by CW4's boss, the Director of Talent Operations (Becky Redd) and Redd's boss, Rod Weidermeyer, Senior VP of Human Resources.

119. Throughout 2017 and through the end of 2018, approximately 50% of the LVT made at the Dalton Plant was scrap and coded not to be shipped. Of the LVT that did ship, nearly 80% was returned by customers who were unsatisfied with what they received.

120. As noted, Mohawk's management was aware of the problems with production and sales. CW6, a distribution manager/plant manager for Mohawk Industries at the Dalton, Georgia, distribution center from April 2014 to November 2019, recounted, "I wouldn't have considered it to be a big secret; they had a lot of second quality product that was sold and a lot that was scrapped."

121. According to CW6, contrary to the Company's statements, Mohawk was not capacity constrained. Demand for LVT from purchasers did not outstrip Mohawk's ability to make LVT. Rather, from April 2017 onward, Mohawk always had plenty of (defective) LVT surplus stockpiled. Indeed, as part of CW6's responsibilities, for at least three years CW6 provided weekly LVT inventory to

Director Logistics Operations Jeremy Tatum and VP Logistics & Distribution Dan Flowers, direct reports of Defendant Brian Carson.

122. According to CW8, a regional sales manager from 2005 through 2009, the problems with Mohawk's LVT were numerous.   "It was hurting our distributors' business," CW8 said.   "They were getting blamed for it." The tile would peel up and didn't match the look and feel of the products IVC had previously made prior to Mohawk's acquisition.  The tiles on display were different than what customers would actually end up with.

123. "It was a nightmare for quite a while," CW8 said. "I don't know that they ever fixed it."  Mohawk couldn't replicate the quality of LVT made overseas when Mohawk tried to make LVT in the U.S.  As a result, for months at a time, Mohawk sales representatives could not fulfill orders for LVT because Mohawk did not have sufficient quality LVT.

### G.   Mohawk Deceives Investors About The Manufacturing Crisis By Producing *More* LVT

124. In contrast to what would be prudent business practices in the face of manufacturing issues, Defendants ordered LVT production to be full-steam-ahead after they discovered that their manufacturing process had crippling flaws.

125. The reason was simple:  by accelerating the pace of production, Defendants were able to claim that they had lowered the average cost of goods sold ("COGS"), since the fixed costs of production could be distributed over a greater

number of units produced.[1]  By making the cost of each unit of LVT appear lower, Mohawk made its margins appear higher, which, in turn, made the Company's earnings appear higher.  But, in reality, the Dalton Plant was not producing much LVT that could be sold at all.

126. Indeed, according to CW9, a Senior Manager of Distribution Operations at Mohawk from May 2017 to September 2019, Mohawk overproduced LVT to mask the Company's true sales.  CW9 and fellow distribution managers joked, "You could print money by making inventory.  Why would you stop producing product if it could just sit in inventory and prop up your balance sheet and make up for sales?  Even if the quality was awful, they were never going to stop it."

127. But storing the unusable LVT became a crisis of its own.  Despite Defendant Lorberbaum's assertion that LVT sales were constrained by manufacturing capacity, the opposite was true—the Dalton LVT plant produced LVT at a pace that dramatically outpaced sales.  And, Mohawk continued to

---

[1]   By way of a simple example to illustrate how increased production can lead to lower COGS under GAAP, consider the following example.  Suppose a factory accrues $10 in fixed costs no matter how many units of goods it produces.  In addition, the factory accrues $1 in costs *per unit* that it produces.  Last year, the factory produced one unit of goods, costing the factory $11.  The COGS was $11 per unit—$11 in total costs, divided by the single unit that it produced.  This year, the factory produced five units of goods, which cost the factory $15.  The COGS is now just $3 per unit—the $15 in total costs, divided by the five units that it produced.

manufacture LVT despite employees at all levels of the company understanding that the LVT was unsalable.  The result was a huge quantity of LVT that needed to go *somewhere*.

128. According to CW6, in *2015*, Mohawk had *36 million square feet* of LVT inventory.  Throughout the Relevant Period, LVT inventory *grew to 90 million square feet* in *2019*.

129. CW6 described that, in 2017 and 2018, GHB, on one of Mohawk's distribution centers, spent $5 million to outfit its space to accommodate the defective LVT.  In 2018, Mohawk had to empty the scrap LVT from over 100 trailers into rented warehouse space.  Mohawk rented warehouse space in Dalton off 11th Ave (approximately 150,000 to 200,000 square feet) and on Goodwill Drive (a little under 100,000 square feet) to store the defective LVT.  The LVT was still stored in these facilities when CW6 left in 2019.  CW6's boss, Jeremy Tatum, was involved in addressing this problem, and personally visited the storage facilities with CW6.  CW6 discussed this regularly with Tatum.

130. It was in part because of this storage crisis that Mohawk was forced to slash prices for its LVT.  According to CW7, Mohawk's U.S. LVT manufacturing center had produced "buildings and buildings" worth of sub-par product.  And, in 2019, according to CW7, Mohawk was forced into "selling [the defective LVT] for pennies on the dollar by the truckload."

131. In addition to producing and storing defective LVT and maintain the product as first-rate inventory on its books, Mohawk did the same with carpet. According to CW9, from May 2017 to September 2019, Mohawk produced excess carpet rolls with full knowledge that there were not customers waiting on them or buyers likely to purchase the surplus product.  This overproduction of carpet rolls came at a time when the Company *already* had a backlog of inventory sitting around—inventory that Mohawk had maintained for years.

132. The three large carpet distribution centers CW9 managed held enough old inventory on the books to fill up six million square feet of warehouse space. According to CW9, 30% of the carpet housed in the existing warehouses had been sitting there for longer than a year.  The carpet that had been stored for a year or more was getting damaged, marred by creases that rendered it unusable.

133. All the while, Mohawk refused to properly account for its ballooning and defective inventory.  According to CW9, Mohawk would not write off, let alone mark down, any of the worthless inventory that piled up in the warehouses and trailers.  Rather, as CW9 acknowledged, Mohawk left the defective inventory on its books, because it made the balance sheet appear stronger than if it had to write off the product that could not be sold or otherwise mark down the product that could only be sold at drastically reduced prices.  Writing off the production

would also require the Company to record additional expenses, which would lower the Company's earnings.

134. Instead of telling investors the truth about the reasons for the rising inventory levels, Mohawk repeatedly attributed the issue to benign business and macroeconomic factors.  For instance, on the first quarter investor call in 2017, Defendant and CFO Boykin acknowledged unusually high inventory but attributed the inventory to "geographic expansion and product growth."

135. Then, starting in the second quarter of 2017, Defendants began attributing rising inventory levels to "raw material inflation and more sourced product needed to support our LVT, ceramic and countertop businesses." According to the Defendants, some combination of "inflation" and "backwards integration" were to blame for the increasing levels of inventory throughout the rest of the Relevant Period.

136. As set forth above, Mohawk's inventories (particularly scrap LVT and massive stockpiles of carpet) were not growing for these reasons, but because Mohawk intentionally produced excess LVT and carpet to drive down the per unit cost of goods sold (COGS) and artificially inflate Mohawk's publicly reported margins and income.  Defendants never mentioned that they were struggling to sell the LVT, much less that they were struggling to sell their LVT because they had bungled the manufacturing process, their product was inferior, and they were

overproducing both LVT and carpet in order to inflate the Company's financial results.

137. The enormity of the excess inventory caused Mohawk to incur substantial expenses, including refitting and renting warehouse space. This overproduction—and the refusal to write down the inventory—of LVT and carpet occurred within Mohawk's Flooring North America Segment run by Defendant Carson, under Carson's direction. In short, while Defendants claimed that they were "focus[ed] on building a company that will last forever," they were actually, in stark contrast to their representations, "focus[ed] on meeting quarterly expectations," and were using undisclosed financial manipulations to meet those expectations and would ultimately harm the financial health of the Company.

### H. Mohawk's Overproduction And Refusal To Write Down Defective Inventories Of LVT And Carpet Result In False And Misleading Financial Statements

138. As noted above, Defendants provided numerous false explanations for their rising inventories. Defendants' refusal to write down the scrap LVT and unsaleable carpet that had been sitting in Mohawk's warehouses (and on its balance sheet) also rendered Mohawk's financial statements false and misleading. During the relevant period, Mohawk assured investors the Company properly accounted for inventory. For instance, in February 2017, the Company falsely stated: "Inventories are stated at the lower of cost or market (net realizable value)" and

that "[a]s of December 31, 2016, the Company has remediated the previously reported material weakness in its internal control over financial reporting related to the design, operation and documentation of internal controls related to the monitoring of inventory cycle counts and the valuation of obsolete inventory . . . ."

139. By way of background, goods in inventory generally have value to a business because it is expected that those goods can be sold and will generate profit at some point.  When a company determines items in inventory have declined in value below the carrying value on the balance sheet, the company must write down the value and create an allowance on its balance sheet.

140. Writing down inventory thus reduces assets on the balance sheet.  A write-down is also treated as an expense, thus net income and retained earnings are also both reduced.  Finally, a write-down also causes an increase in COGS.  COGS is calculated as (i) the beginning inventory for reporting period, (ii) plus purchases made during that period, (iii) minus ending inventory.  Write downs therefore raise COGS, which has the effect of lowering gross profits and lowering operating income.

141. Here, because Mohawk was aware that much of its inventory was defective, it was required to write down the value of that inventory.  Had Mohawk taken an appropriate inventory write-down, it would have impacted both the Company's income statement and the balance sheet.  Doing so would have caused

47

Mohawk to increase the cost of sales, decreasing margins and income, and reduce assets on the balance sheet. But Defendants refused to do so resulting in an inflated balance sheet and income statement during the Relevant Period.

## I.   The "Saturday Scheme" Hides Manufacturing And Inventory Crises And Inflates Sales

142. Rather than come clean to investors about the bungled operation of the Dalton plant and the ensuing inventory crisis, Mohawk chose to manipulate its books through a variation of a channel stuffing scheme to give the appearance that its sales kept pace with production.

143. As an overview, the "Saturday Scheme" operated as follows. *First,* Defendants instructed their inventory and warehouse managers in the Flooring Division to attempt deliveries to customers on the final Saturday of each quarter for product that customers had not requested. *Second*, though Mohawk executives knew that the product would never be delivered, as most Mohawk customers were not open for deliveries on Saturdays, Mohawk would account for the sale of its inventory when it was shipped out. *Third*, the quarter's books would close, containing the falsified sales. And *fourth*, the first working day of the next quarter, warehouse workers would unload the undelivered product and restock it. The process repeated quarter after quarter.

144. At the core of the Saturday Scheme was the Company's practice of shipping its product out to customers who did not ask for it. According to CW5,

the Chief Information Officer for Mohawk Industries' Flooring Division from April 2014 until August 2017, the entire time he worked at Mohawk, the Company had a practice of shipping out product months ahead of schedule to meet projections. "It was a very common practice to ship out everything they could." "You could call it channel stuffing. That's exactly what they did for years. It was standard operating procedure." CW6 described the same conduct at Mohawk as detailed above by CW5. According to CW6, at the end of each quarter there was a nationwide rush to get product off Mohawk's shelves and into the hands of retailers – whether or not the retailers needed or had requested the shipments.

145. CW5 explained that toward the end of each quarter, Mohawk would pull one month or two months' worth of future orders and ship them out ahead of time so that Mohawk could recognize the revenue prematurely. To meet the end-of-year sales goals in December, orders as forward-reaching as late February would be shipped out. These orders would then be sitting in parking lots in a shipping container for months because the customer would not want the expense of sending them back.

146. Per CW5, Mohawk's practice (undisclosed to the public) was that once product had left the factory, the revenue would be recognized. However, the Company would not invoice customers immediately—they would just record the

revenue in the books.  According to CW5, it was obvious to Company insiders what Mohawk was doing:  recognizing revenue prematurely.

147. Further, according to CW5, Defendant Carson was well aware of the routine practice of pulling in future sales.  According to CW5, it was clear and not a secret that Mohawk was shipping out product in order to manipulate earnings and Defendant Carson was present when the plan to ship product early was discussed weekly in staff meetings.  According to CW5, at these meetings it "was standard procedure" that attendees of the meetings would ask: "***What orders can we pull in to hit our forecast***?"

148. CW6 noted that the channel-stuffing scheme was known internally as Mohawk's effort to "***drain the swamp***."  CW6 participated in regular end-of-quarter conference calls with distribution managers from all over the U.S., in which supervisors (including Tatum and Flowers who reported directly to Carson) instructed the group to "drain the swamp," referring to the process of unloading defective LVT inventory on unsuspecting and unwilling purchasers.  And as long as the Company could meet (or approach) its quarterly sales targets, the scheme continued.

149. According to CW9 , a Senior Manager of Distribution Operations at Mohawk from May 2017 to September 2019, the Company utilized the Saturday Scheme to inflate its sales ***in every quarter*** of the Relevant Period, ***except when***

the Company temporarily abandoned the scheme in the second and third quarters of 2018.

150. The temporary break in the scheme in Q2 and Q3 of 2018, according to CW9, was because the Company would not meet its sales targets even by inflating its revenue with the Saturday Scheme.  Mohawk was so off-target that the Saturday Scheme was, essentially, futile for those quarters.  CW9 stated that the Company executives knew that, even with the scheme, Mohawk was too far off to hit its financial targets in those quarters.

151. Mohawk employed the Saturday Scheme from at least 2015 through the first quarter of 2020.  Former employees such as CW10 (a Manager for a Regional Distribution Center for Mohawk Industries from May 1999 until April 2016) and CW11 (a Logistics Business Analyst and a Supply Chain Analyst for Mohawk from January 2019 until April 2020) describe an amazingly consistent practice of shipping on the last Saturday of the quarter over a span of approximately five years.

152. CW10 was personally told to instruct CW10's employees to make deliveries on Saturdays, even though both CW10 and Mohawk knew the customers were closed.  CW10 confirmed CW6's explanation that this scheme was referred to as "draining the swamp."  CW11 was required to work the last Saturday of every quarter to participate in what CW11 called the "end of quarter push."  As CW11 described it, the Company would deliver inventory to customers across the country

on these Saturdays, many of whom were closed, in an attempt to classify the orders as shipped and book the revenue prior to the quarter closing.

153. More specifically, CW11 explained that Mohawk knew 80% of the customers were closed on Saturdays, and even those that were open did not usually accept deliveries on Saturdays, but the Company paid drivers to attempt to make the deliveries so that the Company could mark the inventory as shipped.  Mohawk knew which customers were closed, because Mohawk required customers to provide Mohawk with their hours for receiving shipments.  According to CW11, it was no mistake that Mohawk shipped to these customers on Saturdays when they would not be on location to accept (or formally reject) the shipments.

154. Similarly, according to CW10, truck drivers regularly were unable to deliver product on Saturdays.  CW10 estimated that more than 80% of the materials shipped as part of the Saturday Scheme came back to Mohawk on the same Saturday the shipments were attempted.

155. According to CW10, the Saturday Scheme was not isolated to CW10's region, but occurred all over the United States.  CW10 knew this based on CW10's conversations with other regional managers.  Similarly, CW11 recognized the shipments were material.  The shipments on these Saturdays would typically total about three million pounds of materials, and the revenue booked on each end-of-quarter Saturday was in the millions.

156. CW10 and CW11 also reported that the Saturday Scheme was never done in the middle of the quarter, but always at the end of the quarter. Mohawk's senior managers, including Mohawk's CEO, received regular reports of sales activity showing spikes in sales on the last day of each quarter, according to CW12. CW12 was an Operations Analyst in the Finance IT department from June 2018 to March 2020. CW12 checked the accuracy of data in daily and periodic reports tracking sales activities, which reports were sent to all C-level executives including CEO Lorberbaum. According to CW12, these reports evidenced Mohawk's efforts to ship product at the end of reporting periods. Indeed, when CW12 recognized a "huge spike" in sales at the end of a reporting period, CW12 "wondered if I needed to hold the reports and get the data corrected." CW12's supervisor told CW12 that such spikes were normal because salespeople always tried to make sales at the end of the quarter.

## J.     Plaintiffs Are Unable To Detect Mohawk's Accounting Deceptions

157. While its executives implemented the Saturday Scheme, Mohawk repeatedly assured investors that all was well. This was skillful deception to cover up the serious problems with Mohawk's underlying business that its executives refused to address: the pricey acquisition of a U.S. LVT plant, the failed effort to get that plant to produce a useable LVT product line, and the subsequent ballooning inventory. Rather than reckon with these problems and deal with them head on,

Defendants covered up the problems with the business by telling falsehoods to investors and manipulating their financial records.

158. Indeed, throughout the relevant period, Mohawk knowingly and repeatedly recognized revenue in violation of guidance provided by the United States Securities and Exchange Commission, basic rules of Generally Accepted Accounting Principles ("GAAP"), and the Company's own publicly stated revenue recognition principles.

159. The SEC, applying basic GAAP, provides straightforward rules for the recognition of revenue: "The [SEC] staff believes that revenue generally is realized or realizable and earned when all of  the  following criteria are met: Persuasive evidence of an arrangement exists, Delivery has occurred or services have been rendered, The seller's price to the buyer is fixed or determinable, and Collectability is reasonably assured."  Codification of Staff Accounting Bulletins, Topic 13: Revenue Recognition (internal citations omitted).  The SEC's guidance tracks GAAP.

160. To this end, the Company's (i) 2015 Form 10-K filed with the SEC on February 29, 2016, (ii) 2016 Form 10-K filed with the SEC on February 27, 2017, and (iii) 2017 Form 10-K filed with the SEC on February 28, 2018, all told investors the very clear criteria for recognition of revenue that the Company was purportedly adhering to: "Revenues are recognized when there is persuasive evidence of an

arrangement, delivery has occurred, the price has been fixed or is determinable, and collectability can be reasonably assured."

161. In truth, at least as early as 2016, and throughout 2017 and much of 2018, Defendants knowingly caused Mohawk to recognize revenue in violation of the SEC's guidance, GAAP, and the Company's own publicly stated accounting principles and did so in a purposeful effort to meet Mohawk's and analysts' earnings and revenue projections.

162. As set forth in detail above, Mohawk improperly recognized revenue on product shipped prematurely at the end of reporting periods because, among other things, (i) Mohawk had failed to reach an arrangement with the buyer to purchase the goods prematurely, and (ii) Mohawk had not successfully delivered the goods to the purchaser.

163. All the while, where there were hints that Mohawk's business was unhealthy—for instance, rising inventory levels in quarterly reports during the relevant period—Defendants came up with benign macroeconomic forces that artfully explained away any investor concerns.

164. For instance, inventory days on-hand rose in 2Q 2017, 3Q 2017, 4Q 2017, and 1Q 2018.  But in each of these quarters, the Company attributed those rises in inventory to "raw material inflation," not to problems with Mohawk's product lines or an effort to overproduce product to give the appearance of lower

COGS. Similarly, sales and operating earnings in the Flooring North America segment decreased in 3Q 2017, but this was attributed once again to inflation.

165. Mohawk portrayed its financial statements as GAAP-compliant and truthful, asserting that the Company had strengthened its internal controls in 2016 and adopted updated GAAP revenue and inventory accounting methods in 2018. When pressed by investors on questions about inventory, revenue, and sales, Defendants offered plausible explanations relating to economic conditions of business during the relevant time. Investors, like Plaintiffs, had no way to detect the systematic fraud at the heart of Mohawk's business and accounting practices.

### K.   Mohawk's Frauds Unravel And Mohawk Shares Tank

166. Throughout 2017 and the first quarter of 2018, Mohawk's fraudulent schemes were carried out unabated.

167. However, given the nature of Mohawk's schemes, they could not continue forever. The inventory resulting from the defective LVT and overproduction of LVT and carpet was piling up, and Mohawk was running out of places to conceal it. And the Saturday Scheme, which pulled forward sales from future quarters to meet current quarter financial targets, made it more difficult to make sales in those future quarters because the demand was illusory. In effect, through Mohawk's accounting manipulations, Defendants were jeopardizing

Mohawk's long-term financial prospects to give the appearance that the Company was performing well in the short-term.

168. In reality, no matter the level of manipulation that Mohawk engaged in, Mohawk had more inventory than it could possibly sell and by the second quarter of 2018 Defendants' schemes were no longer sustainable.  Thus, the Company was forced to begin to partially reveal to investors the true state of affairs beginning with its financial reporting after the second quarter of 2018.

169. On July 25, 2018, after markets closed, Mohawk reported its financial results for the second quarter of 2018.  Mohawk "announced 2018 second quarter net earnings of $197 million and diluted earnings per share (EPS) of $2.62.  Adjusted net earnings were $263 million and EPS was $3.51, excluding restructuring, acquisition and other charges, a 6% decrease from last year."

170. These earnings per share fell far short of the Company's guidance of $3.89-$3.98 and analyst' consensus estimates of $3.90.  After meeting or exceeding Company guidance and analysts' expectations quarter after quarter with record quarterly financial results, investors were stunned by the sudden and unexpected major earnings miss.  Defendants attributed the bad quarter to, in part, "lower sales than we anticipated" and acknowledged that margins were "down."

171. In the press release announcing the dismal financial results, Lorberbaum was quoted as stating that the Company's "results fell well short of

our expectations, and we are taking actions to improve the performance of our U.S. businesses."   The press release also acknowledged that Mohawk's "business outside North America showed significant improvement" and that "the results in most of our non-U.S. businesses improved substantially."   In other words, the Company explained that the underperformance stemmed from the Flooring North America division—their very division that was carrying out the fraudulent accounting activities.

172. The Company also lowered its earnings per share guidance for third quarter 2018 to $3.54-$3.64, approximately 20% lower than analysts' consensus estimates of $4.28.

173. CNBC reported that evening that "[s]hares of Mohawk Industries tumbled more than 14 percent in after-hours trading.  The world's largest flooring company missed on both analysts' earnings and revenue expectations for its second quarter.  Mohawk reportedly earned $3.51 per share versus the $3.90 that was estimated.  The company generated $2.58 billion in revenue versus the analysts' estimated $2.60 billion."

174. On July 26, 2018, Mohawk held is earnings call to discuss its financial results for the second quarter 2018.  Plaintiffs attended the call.  During the call, Defendants revealed that, contrary to its prior representations that it was selling out of LVT product and was capacity constrained, the Company had excess inventory

and that it had begun to "produce[] less than [it] sold to reduce inventory." Defendants also disclosed, for the first time, "manufacturing shutdowns," a "lower production rate," and "new product in efficiencies" in the Flooring North America division.  During the call, Defendant Lorberbaum also explained that, "[f]or the second quarter, we accelerated sales of impaired Mohawk inventory. . . ."

175. That same day, *The Motley Fool* reported that Mohawk's shares "plunged in Thursday trading just hours after the flooring manufacturer reported a big earnings miss on Wednesday evening.  As of 2:45 p.m. EDT, Mohawk shares are down a whopping 16%.  Expected to report earnings of $3.88 per share, Mohawk reported adjusted earnings of $3.51 – and GAAP profits of only $2.62. … [A]ctual GAAP profits fell of a cliff – down 25% year over year."

176. Following the July 25-26, 2018 disclosures, analysts at Pacific Square Research raised concerns about Mohawk's prior disclosures, explaining in a July 30, 2018 analyst report that "there is a disconnect between [the Company's] financial models and what is really happening in the business."  The analyst report also warned investors that their review of Mohawk's historical financials "suggests a very long trend of stretching a little bit more each quarter to meet numbers." Likewise, in a July 30, 2018 report analyst at J.P. Morgan advised investors that they should "remain on the sidelines" following the disclosures.

177. On July 25, 2018, prior to the release of the second quarter financial results, Mohawk's stock price closed at $217.38 per share. On July 26, 2018, after the Company announced its dismal results, the stock closed at $179.31. This decline of $38.06 per share—an 18% drop in stock price—wiped out $2.76 billion in shareholder value on unusually heavy trading volumes.

178. The July 25-26, 2018 disclosures, however, only partially revealed the fraud. Defendants made additional false statements to mislead investors regarding the true nature and extent of Mohawk's problems. For example, when asked during the earnings call "what happened" to cause the miss, Lorberbaum did not fully reveal that the dismal financial results arose from temporarily halting the Saturday Scheme, the massive defects in LVT manufacturing and sales, and the excess inventory of defective LVT and carpet.

179. To the contrary, Defendants assured investors that the negative results were temporary, and that the Company's "ramping up" of LVT production in the United States would drive future sales.

180. On October 25, 2018, Mohawk once again reported disappointing financial results. Mohawk reported earnings per share of $3.29 on revenue of $2.55 billion, whereas analysts' consensus estimates were earnings per share of $3.58 on revenue of $2.6 billion. In the Company's press release, Lorberbaum is quoted as follows: "Our third quarter results fell short of our expectations. Sales growth in

all segments was lower than our estimates . . . .   Additional manufacturing reductions were required during the period to control our inventory levels."

181. During the earnings call for the third quarter 2018, Lorberbaum stated that "[s]ales growth in all segments was lower than our estimates," and that "[a]dditional manufacturing reductions were required during the [third quarter] to control inventory."   Lorberbaum also admitted that the Dalton Plant "had both software problems, that the software as we tried to speed it up and make it work, the software was not talking to itself properly, and we also had physical mechanical failures where things broke and we had to replace them."

182. Lorberbaum also revealed that the North America Flooring division had lower margins, with operating margins falling to single digits, due to "lower than expected production."   And much like the prior quarter, the Company lowered earnings per share guidance for the following quarter, guiding to $2.45 to $2.60— well below analysts' consensus expectation of $3.51 earnings per share.

183. Once again, investors were stunned by the news.   In Pacific Square Research's October 29, 2018 analyst report titled "*Floored! Coverage Closed*," the analysts noted that "[t]here is no getting around that Q3 was a disaster for Mohawk" and that "calling it a disaster is being kind."   The report further explained that analysts were "completely blindsided" by the disclosure of weak sales, questioning "what happens if they can't sell all that inventory?"

61

184. Analysts at Wells Fargo, who had "grown increasingly wary of the [Mohawk] story," reported that Mohawk's Q3 2018 results were "truly surprising." Analysts also linked the reduced production rates to the declining margins:  Credit Suisse reported that the "underperformance was driven by lower than expected profitability" and that it reflected, in part, "inventory right-sizing."

185. As a result of this news, Mohawk's stock price declined on October 26, 2018 by 24%, a drop of $36.04 per share (from $151.07 to $115.03), erasing $2.6 billion more in shareholder value on unusually heaving trading volumes.

186. Defendants continued to conceal the full truth from investors. Defendants continued to conceal that the lower sales and large earnings miss resulted from temporarily discontinuing the Saturday Scheme, which Defendants evidently believed (i) was futile because even with the Saturday Scheme the Company's earnings would come in well below analysts' consensus expectations for the quarter and (ii) would be difficult, if not impossible, to mask in the following quarter given their expectations of lower sales going forward. Defendants also continued to conceal that the lower sales and large earnings miss was due to ongoing problems with the Dalton Plant's LVT production and volume of unsalable product that resulted in the excessive inventory.  Instead, Defendants continued to assure investors that the problems were temporary, falsely stating that the manufacturing issues at the Dalton Plant first arose "in the quarter."

187. On November 13, 2018, Mohawk announced that "Brian Carson, former president of the Company's Flooring North America segment, will leave the Company on November 12, 2018 to pursue other interests."  The Company did not disclose that Carson had engineered the channel-stuffing scheme that gave investors a false sense of confidence in the Company.

188. On February 8, 2019, the Company held earnings call for the fourth quarter 2018.  During the call, Lorberbaum told investors that "inventory right-sizing" was complete and that the Company would be "increasing the production rates to match sales going through the year."  And on the April 26, 2019 earnings call for the first quarter 2019, Defendants once again told investors that the inventory issue was "behind us" and that the Company would match "production with the demand for the most part, going forward."

189. Defendants' false statements and omissions concerning sales and excess inventory issues had their intended effect.  In a February 11, 2019 report issued by Jefferies, analysts stated that Mohawk's excess inventory would "dissipate" shortly.  And a May 14, 2019 analyst report by SunTrust Robinson stated that Mohawk's production was now expected to "equal sales," that the inventory correction "should stop the drag," and based on Defendants' explanations "inventory levels look more elevated" than they truly were "due to inflation, some build-up to smooth out start-up actions, and acquisitions."

190. Mohawk's underlying business continued to suffer from the fraudulent scheme into the second quarter of 2019—at which point Defendants' continued misrepresentations came to light.  On July 25, 2019, after the market closed, Mohawk once again reported having excess inventory and lower margins.  Sales and margins declined substantially in the North America Flooring segment.

191. Only the July 26, 2019 earnings call, the Company admitted that, despite its prior assurances that "inventory right-sizing" had been completed, the Company continued to have excess inventory that required "reducing production to manage our inventory levels …."  Lorberbaum further stated that "[w]e're taking actions to improve sales, reduce our costs, manage our inventory and adjust our offerings," and that the "U.S. flooring market is the most difficult" where Mohawk's "flooring North America segment sales decreased 7%" year-over-year and operating margin decreased more than 4% year-over-year.  The Company also finally disclosed that the inventory issues and sales declines were expected to continue and slashed third quarter guidance to account for "excess inventories" and "reduced production," "lower volume and margins," and "increased competition."

192. As a result of this news, Mohawk's stock price declined on July 26, 2019, dropping $27.52, from $156.36 per share to $128.84 per share trading on unusually heavy volumes.

193. The very analysts that had previously accepted the Company's representations that the sales declines and inventory issues were "transitory," now recognized they were not. On July 26, 2019, Evercore ISI issued a report lowered its target price for the Company's stock and noted that "[i]nventory levels have been a significant concern for investors over the last several quarters and will persist, as days in inventory rose once again." As SunTrust Robinson Humphrey stated in its July 25, 2019 analyst report, "this latest blow pushes [the Company] name back to the startling line."

194. This series of partial disclosures revealed to investors, over time, that the true financial condition of Mohawk was not what Defendants had represented to investors in 2017 and the first half of 2018. These disclosures resulted in substantial declines of Mohawk's stock price on the date of the news disclosures individually, and in the aggregate as Mohawk's stock declined by more than 54%, from a price of over $280 in January 2018 to $128 in July 2019. As the truth gradually leaked out through the partial disclosures, $7.4 billion market value was erased.

195. On June 29, 2020, the Class Action Complaint was filed which publicly revealed the (i) Saturday Scheme to inflate quarterly sales in violation of GAAP and the Company's own publicly-disclosed revenue recognition policy; and (ii) the

Company's hiding of defective LVT in its bloated inventories, which the Company failed to mark down as required under GAAP.

196. On July 13, 2020, Mohawk filed a Form 8-K with the SEC disclosing that the Company had received subpoenas from the DOJ and SEC concerning the very same issues raised in the Class Action Complaint.

## VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

197. Plaintiffs began purchasing Mohawk stock in July 2017.  During that period, Plaintiffs owned as much as 1.4 million shares of Mohawk common stock, approximately 4% of Mohawk's outstanding stock.

198. Plaintiffs specifically read and relied upon Defendants' false and misleading statements pertaining to, among other things, the Company's earnings, profit margins, sales of LVT, inventory levels, internal controls, and operations.

199. As detailed below, these statements took place in the Company's written filings with the SEC, presentations and calls with the investing public, and private calls with the Plaintiffs.  The publicly available false and misleading statements described herein

200. These statements misled Plaintiffs into believing that (1) Mohawk was a capable domestic manufacturer of LVT, (2) Mohawk maintained healthy sales of LVT, and (3) Mohawk's margins were among the best in the industry.  More specifically, Defendants' misrepresentations and omissions falsely assured

investors, including Plaintiffs, that Mohawk reported earnings in compliance with GAAP, produced top quality LVT, did not carry defective LVT and carpet as inventory, maintained effective internal controls, properly accounted for sales, and did not engage in deceptive or improper business practices to hit quarterly financial targets.

201. Had Defendants been truthful to Plaintiffs about Mohawk's underlying business activities, Plaintiffs would not have purchased Mohawk stock.

202. Defendants' misrepresentations and omissions caused and maintained artificially inflated prices of Mohawk's stock, which led to Mohawk's stock trading at prices above actual value.

### A.    Pre-Relevant Period – 2016: Full Year and Fourth Quarter

203. On February 9, 2017, Mohawk issued a press release and filed it with the SEC (the "February 9, 2017 Press Release"), which had been approved and/or made on the basis of information provided by the Individual Defendants, reading:

> Mohawk Industries, Inc. (NYSE: MHK) today announced 2016 fourth quarter record net earnings of $234 million and diluted earnings per share (EPS) of $3.13, a 22% increase versus prior year. Excluding restructuring, acquisition expenses and other charges, net earnings were $243 million, and EPS was $3.26, a 16% increase over last year's fourth quarter adjusted EPS. Net sales for the fourth quarter of 2016 were $2.2 billion, up 9% versus the prior year's fourth quarter as reported and 7% on a legacy basis applying constant days and currency rates.

204. The February 9, 2017 Press Release also read: "For the twelve months ending December 31, 2016, net earnings and EPS were $930 million and $12.48, respectively."

205. The February 9, 2017 Press Release continued:

Commenting on Mohawk Industries' fourth quarter and full year performance, Jeffrey S. Lorberbaum, Chairman and CEO, stated, "In the fourth quarter, our sales and earnings per share set records for the period. Our operating margin for the quarter rose to 14.0%, a 150 basis point improvement over the prior year and the highest fourth quarter result in the company's history." "For the full year, Mohawk delivered an outstanding performance. Our revenues for the year rose to an all-time high, our EBITDA increased to $1.7 billion and we generated adjusted operating income of $1.3 billion, up 24% over the prior year, the highest in our history."

206. Further, the Company and the Individual Defendants touted the results of the Flooring North America Division, and its future prospects: "'During the quarter, our Flooring North America Segment's sales increased 10% as reported or 8.5% on a constant day's basis.  Operating income grew 18.5% to a margin of 14.5% as reported, or 15% excluding restructuring, integration and other charges. . . . Our hard surface sales, including LVT, laminate, wood and vinyl, continued their dramatic expansion.  O*ur LVT plant made significant improvements during the period, and we are installing another production line that will double our U.S. capacity by the end of this year*.'"

207. The February 9, 2017 Press Release continued quoting Defendant Lorberbaum:

"Today, Mohawk is in the best position in the company's history. In 2016, we delivered record results as our investment strategy to enhance our product innovation, brands and service continued to benefit our customers and provide the returns we expected. In 2017, we anticipate sales to grow similarly to last year on a local basis with operating margins improving slightly, excluding acquisitions and intellectual property.  Taking all of this into account, our EPS guidance for the first quarter of 2017 is $2.64 to $2.73, which represents an 11% to 15% increase over first quarter 2016."

208. Defendants' statements in the February 9, 2017 Press Release were false and misleading for the following reasons: (i)Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS; (ii) Mohawk's LVT plant produced excessive (more than 50%) of product that was defective, thus rendering Defendant Lorberbaum's statement that "'[o]ur LVT plant made significant improvement'" misleading; and (iii) It was misleading to assert "'Mohawk is in the best position in the company's history'" and provide sales growth and earnings growth projections, without disclosing the Company had obtained 2016 financial metrics via the schemes described herein.

209. After the Company issued the February 9, 2017 Press Release, on February 27, 2017, the Company filed its Form 10-K with the SEC (the "2016 Form 10-K"), which was approved by and/or made on the basis of information

provided by the Individual Defendants.  The 2016 Form 10-K repeated the same false financial results reported in the February 9, 2017 Press Release indicated above.  The financials in the 2016 Form 10-K were false and misleading for the same reasons set forth with respect to the February 9, 2017 Press Release.

210. In addition, the 2016 Form 10-K falsely stated: "Revenues are recognized when there is persuasive evidence of an arrangement, delivery has occurred, the price has been fixed or is determinable, and collectability can be reasonably assured."  In truth, as detailed herein, the Company recognized revenue on product shipped prematurely and without the customers' consent (*i.e.*, without the existence of an arrangement), and which oftentimes was not delivered but returned to the Company's distribution centers.

211. The 2016 Form 10-K also falsely stated: "Inventories are stated at the lower of cost or market (net realizable value)."  In truth, the Company carried in its inventory material amounts of defective LVT and carpeting that had not been marked down to the lower of cost or market (net realizable value).

212. The 2016 Form 10-K also falsely assured investors the Company and Defendants had implemented proper internal controls to monitor inventory levels. Notably, on November 10, 2016, the Company admitted in a Form 10-Q filing that it had been caught by the Public Company Accounting Oversight Board not implementing proper internal controls:

Based on an evaluation of the effectiveness of the Company's disclosure controls and procedures, as of the end of the period covered by this report, the Company's Chief Executive Officer and Chief Financial Officer **have concluded that such controls and procedures were ineffective** at a reasonable assurance level as of the end of the period covered by this report and as of December 31, 2015, **because of a material weakness in internal control over** financial reporting related to documenting management's **inventory** control oversight. Management's conclusion was prompted by questions raised during the Public Company Accounting Oversight Board's routine inspection of the Company's independent registered public accounting firm.

213. The 2016 Form 10-K falsely stated the weakness in internal controls over inventory accounting previously identified on November 10, 2016 had been fixed:

As of December 31, 2016, the Company has remediated the previously reported material weakness in its internal control over financial reporting related to the design, operation and documentation **of internal controls related to the monitoring of inventory** cycle counts and **the valuation of obsolete inventory** at two of the Company's divisions. The remediation was accomplished by updating policies that require specific monitoring activities occur at defined levels and management's conduct of monitoring activities for the inventory cycle counts and the valuation of obsolete inventory in these divisions be evidenced upon completion.

The Company has completed the documentation, implementation and testing of the effectiveness of the design and operation of the remediation actions described above and, **as of December 31, 2016, has concluded that the steps taken have remediated the material weakness**.

214. Defendants' above statements concerning the Company's internal controls related to accounting for its inventory levels were false and misleading because it was widely known within Mohawk that the Company was storing large

amounts of defective and unsellable LVT and carpet carried as inventory at inflated valuation.  Accordingly, the Company had not remediated material weaknesses in its internal controls over accounting for inventory.

215. At or about the same time the Company issued its 2016 Form 10-K, the Company issued its 2016 Annual Report to Shareholders (the "2016 Annual Report") that was posted to the Company's website (where it remained through, at a minimum, March 2021).  The 2016 Annual Report was approved by and/or made on the basis of information provided by the Individual Defendants.

216. In the 2016 Annual Report, Defendants misleadingly stated:  "*While some public companies focus on meeting quarterly expectations or maximizing results in a given year, we focus on building a company that will last forever*.  It's a philosophy that has served our shareholders well, as Mohawk has outperformed the market for more than two decades."  This statement continued to mislead investors, like Plaintiffs, throughout the relevant period.  The Company was aggressively selling sub-standard quality LVT and pulling in sales from future periods to meet quarterly earnings estimates during 2016, 2017 and the first quarter of 2018, and in so doing Mohawk jeopardized its relationships with customers and its ability to make sales in those future periods.  In truth, and contrary to the Company's express statements in the 2016 Annual Report, Mohawk was focused on meeting quarterly numbers and not its long-term business prospects.

217. In the 2016 Annual Report, Defendant Lorberbaum also wrote in his letter to investors: "Mohawk's performance in 2016 was a success by every measure." Defendant Lorberbaum continued:

> A particular area of focus is luxury vinyl tile (LVT), one of the flooring industry's newest and fastest-growing products. Noted for its durability, affordability and realistic visuals, LVT represents a major growth opportunity for Mohawk. ***At present, sales of LVT are outpacing our manufacturing capacity.*** That's why by the end of 2017, we will expand our U.S. and European LVT capacity to further extend our leadership in this category.

218. It was misleading for Defendant Lorberbaum to claim "2016 was a success by every measure" without disclosing the true facts known to him, including the primary "measures" by which investors judged Mohawk – including revenues, earnings, and margins – had been manipulated by Defendants. It was similarly misleading to tell investors Mohawk was capacity constrained in the sale of LVT. As CW6 has confirmed, Mohawk was not capacity-constrained. Mohawk was able to produce excess amounts of defective and unsaleable LVT, such that Mohawk had stored millions of square feet of LVT in warehouses indefinitely.

## B.    2017: First Quarter

219. On April 27, 2017, Mohawk issued a press release and filed it with the SEC (the "April 27, 2017 Press Release"), which had been approved by and/or otherwise made on the basis of information provided by the Individual Defendants, reading:

Mohawk Industries, Inc. (NYSE: MHK) today announced 2017 first quarter record net earnings of $201 million and diluted earnings per share (EPS) of $2.68, a 16.5% increase versus prior year. Excluding restructuring, acquisition expenses and other charges, net earnings were $203 million, and EPS was $2.72, a 14% increase over last year's first quarter adjusted EPS. Net sales for the first quarter of 2017 were $2.22 billion, up 2% versus the prior year's first quarter as reported and 4% applying constant days and currency rates. . . .

Commenting on Mohawk Industries' first quarter performance, Jeffrey S. Lorberbaum, Chairman and CEO, stated, "Our sales and earnings per share set records for the first quarter with volume, mix and productivity adding approximately $60 million to operating income. Our operating margin for the quarter rose to 12.4%, a 110 basis point improvement over the prior year and the highest first quarter result in the company's history.

220. Defendants' statements in the April 27, 2017, Press Release were false and misleading because Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS.

221. After the Company issued the April 27, 2017 Press Release, Mohawk held a conference call for investors on April 28, 2017 (the "April 28, 2017 Conference Call"). During the April 28, 2017 Conference Call, Defendants misleadingly attributed higher margins to increases in productivity (among other things) without disclosing the impact of pulling in sales and overrunning production lines to build product that there was no demand for. For instance,

74

Mohawk's CFO Frank Boykin stated: "Operating margin, excluding charges was 12.6%. This is 100 basis point improvement over last year. This includes productivity of $41 million, volume of $9 million in [sic] price mix of $9 million." In truth, Mohawk artificially inflated the Company's operating margins by overproducing both carpet and LVT to drive down COGS in the short term, even though the Company had millions of square feet of LVT and carpet stored in warehouses with no customer demand for it.

222. During the April 28, 2017 Conference Call, Defendants also misleadingly attributed higher inventories to positive causes. For instance, Mohawk's CFO Frank Boykin stated: "Inventories were $1.741 billion with inventory days at 110 compared to 107 days last year *impacted by geographic expansion and product growth*." In truth, the rise in inventories was attributable to the Company storing millions of square feet of carpet and LVT in inventory that was unsellable and/or there was no customer demand for, and which should have been written down in value but was not.

223. After the Company issued the April 27, 2017 Press Release and hosted the April 28, 2017 Conference Call, on May 5, 2017 the Company filed its Form 10-Q Quarterly Report with the SEC (the "1Q2017 Form 10-Q"), which was approved by and/or made on the basis of information provided by the Individual Defendants. The 1Q2017 Form 10-Q repeated the same false financial results

reported in the April 27, 2017 Press Release indicated above, which financial results were false and misleading for the same reasons set forth with respect to the April 27, 2017 Press Release.

224. The 1Q2017 Form 10-Q misleadingly attributed Mohawk's increase in earnings to legitimate business factors, without mention of the Company's manipulation of revenues, earnings, and inventories:

> For the three months ended April 1, 2017, net earnings attributable to the Company were $200.6 million, or diluted earnings per share ("EPS") of $2.68, compared to the net earnings attributable to the Company of $171.5 million, or diluted EPS of $2.30, for the three months ended April 2, 2016. The increase in diluted EPS for the three months ended April 1, 2017 was primarily attributable to increased sales volumes, savings from capital investments and cost reduction initiatives, the favorable net impact of price and product mix, lower interest rates and the favorable impact of foreign exchange rates on transactions, partially offset by higher input costs, increased employee costs, and costs associated with investments in new product development, sales personnel, and marketing.

225. Similarly, the 1Q2017 Form 10-Q attributed Mohawk's operating income to legitimate business factors, without mention of the Company's manipulation of revenues, earnings, and inventories:

> Operating income for the three months ended April 1, 2017 was $274.8 million (12.4% of net sales) reflecting an increase of $29.1 million, or 11.8%, compared to operating income of $245.7 million (11.3% of net sales) for the three months ended April 2, 2016. The increase in operating income was primarily attributable to savings from capital investments and cost reduction initiatives of approximately $41 million, increased sales volumes of approximately $9 million and the favorable net impact of price and product mix of approximately $9 million, partially offset by higher input costs of approximately $22

million, including increased material costs of approximately $11 million, and approximately $8 million of costs associated with investments in new product development, sales personnel, and marketing.

226. Defendants made similarly misleading statements in the 1Q2017 Form 10-Q attributing the Company's increase in operating earnings at the Flooring North America segment to legitimate causes, without mention of the Company's manipulation of revenues, earnings, and inventories:

Flooring NA segment – Operating income was $92.1 million (9.8% of segment net sales) for the three months ended April 1, 2017 reflecting an increase of $16.8 million compared to operating income of $75.4 million (8.3% of segment net sales) for the three months ended April 2, 2016. The increase in operating income was primarily attributable to savings from capital investments and cost reduction initiatives of approximately $13 million, and increased sales volumes of approximately $5 million.

227. Defendants' statements in the 1Q2017 Form 10-Q concerning the increase in earnings and operating income were false and misleading because these metrics had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS.

228. In the 1Q2017 Form 10-Q, Defendants also falsely assured investors the Company had adopted ASU 2015-11, Simplifying the Measurement of Inventory, and was in compliance with the GAAP rule.  The 1Q2017 Form 10-Q

stated: "The Company adopted the provisions of this update at the beginning of fiscal year 2017.  This update did not have a material impact on the Company's consolidated financial statements."  In truth, Mohawk carried millions of square feet of excess carpet and defective LVT in inventory at inflated values and refused to write down this inventory as required by GAAP.

229. In the 1Q2017 Form 10-Q, Defendants falsely assured investors the Company was actively assessing its revenue recognition practices for compliance with new GAAP requirements.

> In May 2014, the FASB issued Accounting Standards Codification ("ASC") 606, Revenue from Contracts with Customers ... The Company will adopt the provisions of this new accounting standard at the beginning of fiscal year 2018, using the cumulative effect method, and continues to evaluate the impact of the adoption of ASC 606 on its consolidated financial statements. The Company expects to complete its assessment of the impact of adoption of ASC 606 during the first half of 2017.

230. Defendants' statements concerning Mohawk's "assessment" of its revenue recognition practices were false and misleading because, among other things, Defendants knew or recklessly disregarded the Company's channel stuffing practices and Saturday Scheme violated the Mohawk's publicly stated revenue recognition policies, then-existing GAAP and SEC guidance, and the new accounting standards to be implemented in 2018.

### C.    2017: Second Quarter

231. On July 27, 2017, Mohawk issued a press release and filed it with the SEC (the "July 27, 2017 Press Release"), which had been approved by and/or otherwise made on the basis of information provided by the Individual Defendants, reading:

> Mohawk Industries, Inc. (NYSE: MHK) today announced 2017 second quarter record operating income of $356 million, net earnings of $261 million and diluted earnings per share (EPS) of $3.48. Excluding restructuring, acquisition and other charges, net earnings were $278 million and EPS was $3.72, a 7% increase over last year's second quarter adjusted EPS. Net sales for the second quarter of 2017 were $2.5 billion, up 6% versus the prior year's second quarter or an increase of approximately 8% on a constant days and currency basis. . .
>
> For the six months ending July 1, 2017, net earnings and EPS were $461 million and $6.17, respectively. Net earnings excluding restructuring, acquisition and other charges were $482 million and EPS was $6.44, an increase of 10% over the 2016 six-month period adjusted EPS. For the six-month period, net sales were $4.7 billion, an increase of 4% versus prior year as reported or 6% on a constant days and currency basis . . . .
>
> Commenting on Mohawk Industries' second quarter performance, Jeffrey S. Lorberbaum, Chairman and CEO, stated, "During the period, Mohawk delivered record results, generating the highest sales, adjusted operating income and adjusted EPS in the company's history."

232. The July 27, 2017 Press Release also asserted the North America Flooring Segment's sales had increased by 6%, with operating margins of 12% and operating income rising 12%.

233. Defendants' statements in the July 27, 2017 Press Release concerning earnings, revenues and margins were false and misleading because Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS.

234. After the Company issued the July 27, 2017 Press Release, Mohawk held a conference call for investors on July 28, 2017 (the "July 28, 2017 Conference Call"). During the July 28, 2017 Conference Call, Mohawk's CFO misleadingly attributed the growing amount of inventory (increasing to 109 days of merchandise from 105 days of merchandise in the prior year) to "raw material inflation and more sourced product needed to support our LVT, ceramic, and countertop businesses." Defendant Lorberbaum reiterated the increase in inventory was due to inflation and growing the business, "as the material cost go up all of that flows into the inventory immediately" and because "we are building our businesses in different places."

235. Defendants' statements during the July 28, 2017 Conference Call concerning the growth in inventories were false and misleading. Inventories had not grown due to inflation and building the business, so much as Defendants' scheme. In truth, the rise in inventories was attributable to the Company storing

millions of square feet of carpet and LVT in inventory that was unsellable and/or there was no customer demand for, and which should have been written down in value but was not.

236. After the Company issued the July 27, 2017 Press Release, on August 4, 2017 the Company filed its Form 10-Q Quarterly Report with the SEC (the "2Q2017 Form 10-Q"), which was approved by and/or made on the basis of information provided by the Individual Defendants. The 2Q2017 Form 10-Q repeated the same false financial results reported in the July 27, 2017 Press Release indicated above, and is false for the same reasons.

237. The 2Q2017 Form 10-Q misleadingly attributed Mohawk's increase in earnings to legitimate business factors, without mention of the Company's manipulation of revenues, earnings, and inventories:

> The increase in diluted EPS for the three and six months ended July 1, 2017 was primarily attributable to increased sales volumes, savings from capital investments and cost reduction initiatives, the favorable net impact of price and product mix, lower interest rates and the favorable impact of foreign exchange rates on transactions, partially offset by higher input costs, increased employee costs, costs associated with investments in new product development, sales personnel, and marketing, and the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs.

238. Similarly, the 2Q2017 Form 10-Q attributed Mohawk's operating income to legitimate business factors, without mention of the Company's manipulation of revenues, earnings, and inventories:

Operating income for the three months ended July 1, 2017 was $355.8 million (14.5% of net sales) reflecting an increase of $5.1 million, or 1.5%, compared to operating income of $350.7 million (15.2% of net sales) for the three months ended July 2, 2016. The increase in operating income was primarily attributable to savings from capital investments and cost reduction initiatives of approximately $44 million, the favorable net impact of price and product mix of approximately $38 million, and increased sales volume of approximately $13 million, partially offset by higher input costs of approximately $58 million, including increased material costs of approximately $41 million, approximately $7 million of costs associated with investments in new product development, sales personnel, and marketing, the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs of approximately $19 million, the net impact of unfavorable foreign exchange rates of approximately $2 million, and investments in expansion of production capacity of approximately $3 million.

239. Defendants made similarly misleading statements in the 2Q2017 Form 10-Q attributing the Company's increase in operating earnings at the Flooring North America segment to legitimate causes, without mention of the Company's manipulation of revenues, earnings, and inventories:

*Flooring NA segment* – Operating income was $127.5 million (12.3% of segment net sales) for the three months ended July 1, 2017 reflecting an increase of $8.5 million compared to operating income of $118.9 million (12.1% of segment net sales) for the three months ended July 2, 2016. The increase in operating income was primarily attributable to the favorable net impact of price and product mix of approximately $20 million, savings from capital investments and cost reduction initiatives of approximately $12 million, and increased sales volumes of approximately $6 million, partially offset by higher input costs of approximately $22 million, including increased material costs of approximately $17 million, and the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs of approximately $6 million.

82

240. Defendants' statements in the 2Q2017 Form 10-Q concerning the increase in earnings and operating income were false and misleading because Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS.

241. In the 2Q2017 Form 10-Q, Defendants also falsely assured investors the Company was preparing for the adoption of Accounting Standards Codification ("ASC") 606, Revenue from Contracts with Customers, by analyzing Mohawk's compliance with the ASC 606 standards.  The 2Q2017 misleadingly assured investors the Company was in compliance with the revenue recognition rule:

> The Company continues to analyze the adoption of ASC 606, including certain contracts that could result in a change in the timing of the recognition of revenue, the identification of new controls and processes designed to meet the requirements of the standard, and the required new disclosures upon adoption. ***At this time ASC 606 is not expected to have a material impact on the amounts reported in the Company's consolidated financial position, results of operations or cash flows.***

242. In truth, the Company recognized revenue on product shipped prematurely and without the customers' consent (*i.e.*, without the existence of an arrangement), and which oftentimes was not delivered but returned to the

Company's distribution centers, in violation of both then-existing applicable accounting rules and ASC 606.

243. The 2Q2017 Form 10-Q also falsely assured investors the Company's inventory levels were properly accounted for:

> In July 2015, the FASB issued ASU 2015-11, Simplifying the Measurement of Inventory. This update changes the measurement principle for inventory for entities using FIFO or average cost from the lower of cost or market to lower of cost and net realizable value. . . .The Company adopted the provisions of this update at the beginning of fiscal year 2017. This update did not have a material impact on the Company's consolidated financial statements.

244. In truth, the Company carried in its inventory material amounts of defective and unsellable LVT and carpeting that had not been marked down to the lower of cost and net realizable value.

## D.    2017: Third Quarter

245. On October 26, 2017, Mohawk issued a press release and filed it with the SEC (the "Oct. 26, 2017 Press Release"), which had been approved by and/or otherwise made on the basis of information provided by the Individual Defendants, reading:

> Mohawk Industries, Inc. (NYSE: MHK) today announced 2017 third quarter, net earnings of $270 million and diluted earnings per share (EPS) of $3.61. Adjusted net earnings were $281 million and EPS was $3.75, excluding restructuring, acquisition and other charges, a 7% increase over last year. Net sales for the third quarter of 2017 were $2.4 billion, up 7% in the quarter and 5% on a constant days and currency basis. . . .

For the nine months ending September 30, 2017, net earnings and EPS were $731 million and $9.77, respectively. Adjusted net earnings and EPS were $763 million and $10.19, excluding restructuring, acquisition and other charges, a 9% increase over last year. For the nine-month period, net sales were $7.1 billion, an increase of 5% and 5.5% on a constant days and currency basis. . . .

Commenting on Mohawk Industries' third quarter performance, Jeffrey S. Lorberbaum, Chairman and CEO, stated, "During the period, Mohawk delivered record adjusted earnings and EPS, with sales growing approximately 7%. . . . Our many operational and process improvements resulted in productivity gains of approximately $49 million "

246. The Oct. 26, 2017 Press Release continued:

"During the quarter, our Flooring North America Segment's sales increased 2% as reported. The segment's price, mix and productivity improved significantly during the period, covering increases in raw materials and other inflation. Our new product introductions improved our average selling prices and margins, and our process innovations and investments in manufacturing technology improved our costs. The hurricanes in Texas and Florida interrupted normal purchasing patterns and impacted our sales during the period. . . . We have enhanced the productivity of our U.S. LVT operations, and we are expanding our product offering in both the residential and commercial categories. We have introduced a proprietary rigid LVT collection designed for exceptional stability and durability as we prepare for our new U.S. LVT production in the second quarter of next year."

247. Defendants' statements in the Oct. 26, 2017 Press Release were false and misleading for the following reasons: (i) Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of

LVT and carpet (beyond what Mohawk could sell) to drive down COGS; and, (ii) Mohawk's U.S. LVT operations were plagued by production problems causing over half of the LVT to be defective, and any assurance of "enhanced . . . productivity" was misleading without a disclosure concerning the ongoing production problems.

248. After the Company issued the Oct. 26, 2017 Press Release, Mohawk held a conference call for investors on October 27, 2017 (the "Oct. 27, 2017 Conference Call"). During the Oct. 27, 2017 Conference Call, Defendants asserted Mohawk was capacity constrained – demand for its LVT and carpet products was higher than the Company's manufacturing ability. Chris Wellborn, Mohawk's President and Chief Operating Officer, with the approval of the Defendants, stated: "Capacity limitations in laminate, LVT and some residential carpet categories constrained our sales during the period and will be addressed in the fourth quarter." Later in the call, Defendant Lorberbaum answered a question about what Mohawk meant by capacity constrained. Lorberbaum stated "we increased the capacity of our LVT through productivity initiatives[,] *we were selling all of that we could have*."

249. Defendants boasted of the Company's U.S. based LVT production capabilities, without any hint of the problems the Company was dealing with. With the approval of Defendants, Wellborn stated: "We have enhanced the productivity of our U.S. LVT operations and we are expanding our product offering in both

residential and commercial categories.  We introduced a proprietary rigid LVT collection designed for exceptional stability and durability as we prepare for new U.S. LVT production in the second quarter next year."

250. Concerning the growing LVT market, Defendant Lorberbaum assured investors "the U.S. is a head [sic] of the rest of the world in the use of the LVT. . . . [W]e think we're putting ourselves in the best position by having the lowest cost and largest capacity in the U.S. to support it [the growing sales of LVT]."

251. Defendants' statements concerning LVT during the Oct. 27, 2017 Conference Call were false and misleading for the following reasons:  (i) As CW6 confirmed, Mohawk was not capacity constrained.  Mohawk was able to produce excess amounts of *defective* and *unsaleable* LVT, such that Mohawk had stored millions of square feet of LVT in warehouses indefinitely. (ii) Further, Mohawk's purported "enhanced . . . productivity" of its U.S. LVT operations had *not* put Mohawk in "the best position" to capture the growing LVT market as Mohawk's U.S. LVT production continued to be plagued by manufacturing problems causing over 50% of the LVT produced to be defective.

252. During the Oct. 27, 2017 Investor Call, Defendants also represented that the Company's rising inventory and slowing inventory turnover were attributable to "raw material inflation and source product growth."  Specifically, Mohawk's CFO, with the approval of all Defendants, stated: "Our inventories

ended the quarter at $1,911,000,000.  We had 112 days of inventory on hand, with raw material inflation and source product growth impacting the days."

253. Defendants' statements in the Oct. 27, 2017 Conference Call regarding the cause of rising inventory levels were false and misleading.  Growing inventory levels were not due to "raw material inflation and source product growth" – but to Defendants' refusal to write down the value of millions of square feet of defective and unsaleable carpet and LVT.

254. After the Company issued the Oct. 26, 2017 Press Release, on November 3, 2017 the Company filed its Form 10-Q Quarterly Report with the SEC (the "3Q2017 Form 10-Q"), which was approved by and/or made on the basis of information provided by the Individual Defendants.  The 3Q2017 Form 10-Q repeated the same false financial results reported in the Oct. 26, 2017 Press Release indicated above, and is false for the same reasons

255. The 3Q2017 Form 10-Q misleadingly attributed Mohawk's increase in earnings to legitimate business factors, without mention of the Company's manipulation of revenues, earnings, and inventories:

> The increase in diluted EPS for the nine months ended September 30, 2017 was primarily attributable to savings from capital investments and cost reduction initiatives, the favorable net impact of price and product mix, and lower interest rates, partially offset by higher input costs, increased employee costs, and the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs.

256. Defendants made similarly misleading statements in the 3Q2017 Form 10-Q attributing the Company's increase in operating earnings to legitimate causes, without mention of the Company's manipulation of revenues, earnings, and inventories:

> Operating income for the three months ended September 30, 2017 was $380.1 million (15.5% of net sales) reflecting an increase of $1.8 million, or 0.5%, compared to operating income of $378.3 million (16.5% of net sales) for the three months ended October 1, 2016. The increase in operating income was primarily attributable to savings from capital investments and cost reduction initiatives of approximately $49 million, the favorable net impact of price and product mix of approximately $62 million, and the net impact of favorable exchange rates of approximately $4 million, partially offset by higher input costs of approximately $61 million, including increased material costs of approximately $47 million, approximately $6 million of costs associated with investments in new product development, sales personnel, and marketing, the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs of approximately $29 million, decreased sales volumes of approximately $9 million, primarily attributable to lower patent revenue, increased employee costs of approximately $4 million, and costs associated withinvestments in expansion of production capacity of approximately $3 million.

257. Defendants made similarly misleading statements in the 3Q2017 Form 10-Q attributing the changes in the Flooring North America segment operating earnings to legitimate causes, without mention of the Company's manipulation of revenues, earnings, and inventories:

> *Flooring NA segment* - Operating income was $163.5 million (15.8% of segment net sales) for the three months ended September 30, 2017 reflecting a decrease of $7.0 million compared to operating income of $170.5 million (16.9% of segment net sales) for the three months

ended October 1, 2016. The decrease in operating income was primarily attributable to the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs of approximately $25 million. Restructuring, acquisition and integration-related, and other costs were higher primarily due to the absence of approximately $90 million received related to a contract dispute, partially offset by the approximately $48 million charge related to the write-off of the Lees tradename that were recorded in the prior year. Also contributing to the change in operating income were the favorable net impact of price and product mix of approximately $32 million and savings from capital investments and cost reduction initiatives of approximately $25 million, partially offset by higher input costs of approximately $29 million, including increased material costs of approximately $24 million, and a decrease in sales volumes of approximately $4 million

258. Defendants' statements in the 3Q2017 Form 10-Q concerning the changes in earnings and operating income were false and misleading because Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales fromfuture periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS.

259. In the 3Q2017 Form 10-Q, Defendants also falsely assured investors the Company was preparing for the adoption of Accounting Standards Codification ("ASC") 606, Revenue from Contracts with Customers, by analyzing Mohawk's compliance with the ASC 606 standards.  The 3Q2017 misleadingly assured investors the Company was in compliance with the revenue recognition rule: "*At*

*this time ASC 606 is not expected to have a material impact on the amounts reported in the Company's consolidated financial position, results of operations or cash flows.*" In truth, the Company recognized revenue on product shipped prematurely and without the customers' consent (*i.e.*, without the existence of an arrangement), and which oftentimes was not delivered but returned to the Company's distribution centers, in violation of applicable accounting rules and ASC 606.

260. The 3Q2017 Form 10-Q also falsely assured investors the Company's inventory levels were properly accounted for:

> In July 2015, the FASB issued ASU 2015-11, Simplifying the Measurement of Inventory. This update changes the measurement principle for inventory for entities using FIFO or average cost from the lower of cost or market to lower of cost and net realizable value. . . .The Company adopted the provisions of this update at the beginning of fiscal year 2017. This update did not have a material impact on the Company's consolidated financial statements.

261. In truth, the Company carried in its inventory material amounts of defective and unsellable LVT and carpeting that had not been marked down to the lower of cost and net realizable value.

### E.     2017: Fourth Quarter and Full Year

262. On February 8, 2018, Mohawk issued a press release and filed it with the SEC (the "February 8, 2018 Press Release"), which had been approved by

and/or otherwise made on the basis of information provided by the Individual

Defendants, reading:

> Mohawk Industries, Inc. (NYSE: MHK) today announced 2017 fourth quarter net earnings of $240 million and diluted earnings per share (EPS) of $3.21. Adjusted net earnings were $256 million and EPS was $3.42, excluding restructuring, acquisition and other charges, a 5% increase over last year. Net sales for the fourth quarter of 2017 were $2.4 billion, up 8.5% in the quarter and 6% on a constant days and currency basis. . . .

> For the year ended December 31, 2017, net earnings and EPS were $972 million and $12.98, respectively. Adjusted net earnings and EPS were $1,019 million and $13.61, excluding restructuring, acquisition and other charges, an 8% increase over last year. For the year ended December 31, 2017, net sales were $9.5 billion, an increase of 6% as reported and on a constant days and currency basis. . . .

> Commenting on Mohawk Industries' fourth quarter and full-year performance, Jeffrey S. Lorberbaum, Chairman and CEO, stated, "In 2017, our strong organization and long-term strategies allowed Mohawk to deliver ***record-breaking results***. For the full year, we generated operating income of $1.4 billion, up 6% as reported and 9% excluding restructuring, acquisition and other charges, and our EBITDA rose to $1.8 billion, both records. ***Our recurring business income grew at a much higher rate in 2017*** when excluding the expired patent income and incremental start-up investments. During the year, we identified opportunities for growing our business, differentiating our products and improving our productivity, which we supported with over $900 million in internal investments, the highest in company history.

> 263. The February 8, 2018 Press Release continued, quoting Defendant

Lorberbaum:

> "During the quarter, our Flooring North America Segment's sales increased 3% as reported. The segment's margins increased approximately 130 basis points as reported We are expanding our

rigid and flexible LVT offerings with specific products tailored for each of the residential, do-it-yourself, apartment and commercial markets. During the quarter, we increased our marketing investments in LVT to expand our sales in anticipation of our new manufacturing line, which will begin production in the second quarter."

264. Defendants' statements in the February 8, 2018 Press Release were false and misleading for the following reasons: (i) Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS; and, (ii) Mohawk's U.S. LVT operations were plagued by production problems causing over half of the LVT to be defective, and any discussion of "expanding . . . LVT offerings" was misleading without a disclosure concerning the ongoing production problems.

265. After the Company issued the February 8, 2018 Press Release, Mohawk held a conference call for investors on February 9, 2018 (the "February 9, 2018 Conference Call"). During the February 9, 2018 Conference Call, Defendant Lorberbaum misleadingly asserted the North American Flooring segment had achieved excellent financial results attributed to the sales of LVT and carpet: "In the Flooring North America segment sales were $999 million, a 3% increase. We had good growth in both LVT and in Carpet. Our operating margin excluding

charges was 16.7%. It improved 160 basis points as positive price mix of $21 million and productivity of $22 million offset $20 million of inflation."

266. Mohawk's CFO Frank Boykin also misleadingly attributed the cause of rising inventory levels to benign factors: "Our inventories were $1.949 billion with inventories at 119 days. Inventories have been impacted by higher raw material cost, ramp up of new products and backwards integration. We anticipate lowering our inventory next year."

267. Lorberbaum misleadingly attributed Mohawk's increase in sales and earnings to legitimate business factors, without mention of the Company's manipulation of revenues, earnings, and inventories:

> Over the past three years, our strategies of adding new products, increasing our capacities and acquiring new businesses have led to an expanded earnings even as income from our Click patent expired. Our 2017 results reflected the impact of these strategies including 34 million of start-up costs to ramp up new products and production and significant increases in raw materials.

268. Defendant Lorberbaum also assured investors the Company's expansion into LVT production was going well, stating "[w]e're the largest manufacturer of LVT. We're putting on much more. We have a significant head start of anybody in making low-cost automated LVT in the world, and we think we're well-positioned." He further stated: "LVT as a product coming into the marketplace has grown faster than anything that I've seen in my 40 years of history…. W*e're at the forefront of making highly-automated low-cost*

*production on a local basis which nobody else has like we do and it's going to advantage us long- term*, however in the short-term it's impacted our speed-to-market of new introductions because we're going through the learning curves but *we're way ahead of everybody else*."

269. The statements in the February 9, 2018 Conference Call were false and misleading for the following reasons: (i) By partially attributing sales growth in the North American Flooring Segment to growing sales of LVT, Defendants were obligated to disclose the North American Flooring Segment both increased revenues by pulling in sales from future quarters and the production of LVT was hampered by production problems such that most of the LVT product was defective and unsaleable; (ii) Margins of 16.7% had been improperly inflated by running production lines in excess of customer demand, and refusing to write down the excess LVT and carpet sitting in inventory; (iii) Mohawk's "expanded earnings" were due to the schemes alleged herein, and not to the growth "strategies" Defendants described; and (iv) Mohawk's "significant head start" in the production of LVT, and other positive superlatives, were severely and negatively impacted by the Company's inability to produce "first grade" LVT that consumers would purchase.

270. After the Company issued the February 8, 2018 Press Release, on February 28, 2018 the Company filed its Form 10-K with the SEC (the "2017 Form

10-K"), which was approved by and/or made on the basis of information provided by the Individual Defendants. The 2017 Form 10-K repeated the same false financial results reported in the February 8, 2018 Press Release indicated above. The 2017 Form 10-K also falsely reported that "[n]et sales for 2017 were $9,491.3 million, reflecting an increase of $532.2 million, or 5.9%" and that, for Flooring North America, "[n]et sales increased $145.1 million, or 3.8%, to $4,010.9 million for 2017, compared to $3,865.7 million for 2016." The financials in the 2017 Form 10-K were false and misleading for the same reasons set forth with respect to the February 8, 2018 Press Release.

271. The 2017 Form 10-K also misleadingly attributed Mohawk's increased earnings to legitimate business factors, without mention of the Company's manipulation of revenues, earnings, and inventories: "The increase in EPS was primarily attributable to savings from capital investments and cost reduction initiatives, the favorable net impact of price and product mix, and lower interest rates, partially offset by higher input costs, increased employee costs, and the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs."

272. Defendants made similarly misleading statements in the 2017 Form 10-K attributing the Company's increase in operating earnings to legitimate causes,

without mention of the Company's manipulation of revenues, earnings, and inventories:

> Operating income for 2017 was $1,354.2 million (14.3% of net sales) reflecting an increase of $74.2 million, or 5.8%, compared to operating income of $1,279.9 million (14.3% of net sales) for 2016. The increase in operating income was primarily attributable to savings from capital investments and cost reduction initiatives of approximately $178 million and the favorable net impact of price and product mix of approximately $169 million, partially offset by higher input costs of approximately $195 million, including increased material costs of approximately $137 million, approximately $23 million of costs associated with investments in new product development, sales personnel, and marketing, increased employee costs of approximately $13 million, and the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs of approximately $45 million.

273. Defendants made similarly misleading statements in the 2017 Form 10-K attributing the increase in the Flooring North America segment operating earnings to legitimate causes, without mention of the Company's manipulation of revenues, earnings, and inventories:

> *Flooring NA Segment*—Operating income was $540.3 million (13.5% of segment net sales) for 2017 reflecting an increase of $35.2 million, or 7.0%, compared to operating income of $505.1 million (13.1% of segment net sales) for 2016. The increase in operating income was primarily attributable to savings from capital investments and cost reduction initiatives of approximately $71 million, and the favorable net impact of price and product mix of approximately $74 million, partially offset by higher input costs of approximately $72 million, including increased material costs of approximately $54 million, and the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs ofapproximately $33 million.

97

274. Defendants' statements in the 2017 Form 10-K concerning the cause of increased earnings and income were false and misleading for the same reasons that each of the 2017 10-Qs were false and misleading, as set forth in detail above.

275. In addition, the 2017 Form 10-K falsely stated: "Revenues are recognized when there is persuasive evidence of an arrangement, delivery has occurred, the price has been fixed or is determinable, and collectability can be reasonably assured."  In truth, the Company recognized revenue on product shipped prematurely and without the customers' consent (*i.e.*, without the existence of an arrangement), and which oftentimes was not delivered but returned to the Company's distribution centers.

276. In addition, the 2017 Form 10-K falsely stated: "Revenues are recognized when there is persuasive evidence of an arrangement, delivery has occurred, the price has been fixed or is determinable, and collectability can be reasonably assured." In truth, the Company recognized revenue on product shipped prematurely and without the customers' consent (*i.e.*, without the existence of an arrangement), and which oftentimes was not delivered but returned to the Company's distribution centers.

277. The 2017 Form 10-K also falsely stated: "Inventories are stated at the lower of cost or market (net realizable value)."  In truth, the Company carried in

its inventory material amounts of defective LVT and carpeting that had not been marked down to the lower of cost or market (net realizable value).

278. At or about the same time the Company issued its 2017 Form 10-K, the Company issued its 2017 Annual Report to Shareholders (the "2017 Annual Report") that was posted to the Company's website (where it remained through, at a minimum, March 2021).  In the 2017 Annual Report, Defendant Lorberbaum misleadingly wrote in his letter to shareholders:

> **We began 2017 with Mohawk in the best position in its history and concluded the year even stronger**. For the second consecutive year, Mohawk generated record revenue, operating income and EBITDA — all while supporting new growth opportunities through $900 million in internal investments, also a record level. That performance reflects both the effective execution of **our long-term strategy** and the strength of our organization.

279. Defendant Lorberbaum's letter also highlighted that Mohawk was supposedly "capitalizing on the accelerating popularity of luxury vinyl tile (LVT) by expanding residential and commercial distribution in the U.S. and Europe."

280. Further still, Defendant Lorberbaum misleadingly claimed the Company's acquisition of IVC had been an exemplar of success:

> The common thread across these initiatives is the ability to leverage the strengths of one business into another. Consider IVC, which we acquired in 2015 to enter the LVT category. Already the LVT market leader in Europe, IVC was quickly positioned to capitalize on the explosive growth in the U.S. by exploiting Mohawk's extensive customer relationships, marketing expertise and distribution channels in North America  In each case, we're able to grow our business in capital-efficient ways to maximize returns.

281. Defendants' statements in the 2017 Annual Report were false and misleading for the following reasons: (i) the contention that Mohawk was "even stronger" than early 2017 when the Company was in the "best position in its history" – or that Mohawk was effectively executing on its "long-term strategy" – were materially misleading in light of Defendants' various schemes to meet short term analyst financial expectations; (ii) Mohawk was not effectively "capitalizing on the accelerating popularity of luxury vinyl tile" but had bungled its efforts to grow market share in LVT by failing to fix problems in its U.S. LVT Plant; and (iii) Mohawk's acquisition of IVC had not been an exemplar of success, as the U.S. LVT Plant acquired by Mohawk in the IVC transaction was riddled with production problems.

## F.    2018: First Quarter

282. On April 26, 2018, Mohawk issued a press release and filed it with the SEC (the "Apr. 26, 2018 Press Release"), which had been approved by and/or otherwise made on the basis of information provided by the Individual Defendants, reading:

> Mohawk Industries, Inc. (NYSE: MHK) today announced 2018 first quarter net earnings of $209 million and diluted earnings per share (EPS) of $2.78. Adjusted net earnings were $225 million and EPS was $3.01, excluding restructuring, acquisition and other charges, an 11% increase over last year. Net sales for the first quarter of 2018 were $2.4 billion, up 9% in the quarter and 4% on a constant currency basis. . . .

Commenting on Mohawk Industries' first quarter performance, Jeffrey S. Lorberbaum, Chairman and CEO, stated, "Mohawk is benefiting from its diverse geographical footprint and product portfolio. ***Our performance in the first quarter accentuated this strength as we realized significant growth in LVT in our largest markets*** and sales and profits grew strongly in our ceramic business outside the U.S."

283. Defendants' statements in the Apr. 26, 2018 Press Release were false and misleading because Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS.

284. After the Company issued the Apr. 26, 2018 Press Release, Mohawk held a conference call for investors on April 27, 2018 (the "Apr. 27, 2018 Conference Call"). During the Apr. 27, 2018 Conference Call, Defendants repeated the financial results published in the Apr. 26, 2018 press release, which were false and misleading for the same reasons.

285. Defendant Lorberbaum boasted about Mohawk's LVT business in the United States. Regarding LVT, he stated Mohawk's "strategy[,] unlike others, of having low-cost, high volume capacity gives [Mohawk] competitive advantages." Lorberbaum concealed and failed to disclose that Mohawk's U.S. LVT production was plagued by defects so severe that the majority of the product was unsellable,

the disclosure of which was necessary to make his statements not misleading to investors.

286. In addition, Defendants reiterated that Mohawk's sales of LVT were capacity constrained – demand for Mohawk's LVT products was higher than the Company's manufacturing ability.  During the call, Chris Wellborn, Mohawk's President and Chief Operating Officer, with the approval of the Defendants, stated: "So our ongoing business had good growth with LVT and wood panels performing the best.  Our LVT was constrained in the period and the new production will increase sales and add new products."  As CW6 confirmed, Mohawk was not capacity constrained.  Mohawk was able to produce excess amounts of *defective* and *unsaleable* LVT, such that Mohawk had stored millions of square feet of LVT in warehouses indefinitely.

287. During the Apr. 27, 2018 Conference Call, Defendants also represented that the Company's rising inventories and slow inventory turnover were attributable to "increasing inflation and our backwards integration."  Mohawk's CFO, with the approval of all Defendants stated:  "Inventories were $2,045 million with inventory days at 116 days, which improved over the fourth quarter. Inventory turns continue to be impacted by increasing inflation and our backwards integration."   In truth, Defendants had purposefully grown the Company's

inventories to lower COGS and inflate margins and earnings, and refused to write down defective and unsaleable carpet and LVT.

288. After the Company issued the Apr. 26, 2018 Press Release, on May 4, 2018 the Company filed its Form 10-Q Quarterly Report with the SEC (the "1Q2018 Form 10-Q"), which was approved by and/or made on the basis of information provided by the Individual Defendants. The 1Q2018 Form 10-Q repeated the same false financial results reported in the Apr. 26, 2018 Press Release indicated above. The financials in the 1Q2018 Form 10-Q were false and misleading for the same reasons set forth with respect to the Apr. 26, 2018 Press Release.

289. The 1Q2018 Form 10-Q misleadingly attributed Mohawk's increase in earnings to legitimate business factors, without mention of the Company's manipulation of revenues, earnings, and inventories:

> Net earnings attributable to the Company were $208.8 million, or diluted EPS of $2.78 for 2018 compared to net earnings attributable to the Company of $200.6 million, or diluted EPS of $2.68 for 2017. The increase in EPS was primarily attributable to savings from capital investments and cost reduction initiatives, the favorable net impact of price and product mix, and the decrease in income tax expense due to the lower effective tax rate as a result of the recent reforms in the U.S. and Belgium, partially offset by higher inflation costs, and the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs.

290. In truth, the Company had increased EPS by, in part, pulling in sales from future periods by channel stuffing and the Saturday Scheme, overproducing

product to drive down COGS, and refusing to write down defective inventory. Had Mohawk properly accounted for revenues and inventory, it would not have achieved the net earnings gains it boasted of.

291. Defendants also made similarly misleading statements in the 1Q2018 Form 10-Q regarding the Company's operating earnings at the parent company and the Flooring North America segment.

> Operating income for the three months ended March 31, 2018 was $268.4 million (11.1% of net sales) reflecting a decrease of $6.4 million, or 2.3%, compared to operating income of $274.8 million (12.4% of net sales) for the three months ended April 1, 2017. The decrease in operating income was primarily attributable to higher inflation costs of approximately $52 million, including increased material costs of approximately $34 million, approximately $19 million due to the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs, and approximately $9 million of startup costs associated with large in investments to expand sales, add product categories, and enter new markets, partially offset by the favorable net impact of price and product mix of approximately $38 million, savings from capital investments and cost reduction initiatives of approximately $31 million, and the net impact of favorable exchange rates of approximately $8 million.

> *Flooring NA segment* – Operating income was $74.7 million (7.9% of segment net sales) for the three months ended March 31, 2018 reflecting a decrease of $17.4 million compared to operating income of $92.1 million (9.8% of segment net sales) for the three months ended April 1, 2017. The decrease in operating income was primarily attributable to higher inflation costs of approximately $25 million, including increased material costs of approximately $20 million, and approximately $14 million due to the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs, partially offset by the favorable net impact of price and product mix

of approximately $14 million and savings from capital investments
and cost reduction initiatives of approximately $13 million.

292. Operating income year-over-year had declined.  Defendants misled
investors as to the true size of the decline in operating earnings by pulling in future
sales and refusing to write down defective inventory.  Further, Defendants misled
investors as to the causes of declining operating income by not revealing that the
Company had (i) manipulated revenues by pulling in sales and the Saturday
Scheme, and (ii) produced defective LVT and excess carpet, which was carried as
inventory without being properly marked down.  By the first quarter of 2018, these
practices had created a deep hole the Company could not get out of, thus hampering
Mohawk's ability to continue to grow operating income and meet operating income
targets for the first quarter of 2018.

293. In the 1Q2018 form 10-Q, Defendants also falsely assured investors the
Company had successfully reviewed and adopted new standards for the recognition
of revenue:

> On January 1, 2018, the Company adopted the new accounting
> standard, ASC 606, Revenue from Contracts with Customers and all
> the related amendments ("ASC 606") and applied the provisions of
> the standard to all contracts using the modified retrospective method.
> The cumulative effect of adopting the new revenue standard was
> immaterial and no adjustment has been recorded to the opening
> balance of retained earnings. . . The Company reviewed all of its
> revenue product categories under ASC 606 and the only changes
> identified were . . . immaterial.     The adoption of ASC 606 did
> not have a material impact on the amounts reported in the Company's
> consolidated financial position, results of operations or cash flows.

294. In truth, the Company recognized revenue on product shipped prematurely and without the customers' consent (*i.e.*, without the existence of an arrangement), and which oftentimes was not delivered but returned to the Company's distribution centers, in violation of applicable accounting rules and ASC 606.

## G.    2018: Second Quarter

295. In a Press Release filed with the SEC on July 25, 2018 ("July 25, 2018 Press Release"), Mohawk made the following financial reports signed and approved by Defendants Lorberbaum and Boykin:

> Mohawk Industries, Inc. (NYSE: MHK) today announced 2018 second quarter net earnings of $197 million and diluted earnings per share (EPS) of $2.62. Adjusted net earnings were $263 million and EPS was $3.51, excluding restructuring, acquisition and other charges, a 6% decrease from last year. Net sales for the second quarter of 2018 were $2.6 billion, up 5% in the quarter and 3% on a constant currency basis. For the second quarter of 2017, net sales were $2.5 billion, net earnings were $261 million and EPS was $3.48; adjusted net earnings were $278 million and EPS was $3.72, excluding restructuring, acquisition and other charges.

296. In the July 25, 2018 Press Release, Defendant Lorberbaum offered the following statement concerning Mohawk's missed earnings projections:  "[O]ur results were negatively impacted by input inflation, higher transportation costs, a stronger dollar and a tight labor market. . . . To address these, we are raising prices, expanding in growing channels and participating in new products and geographies.

In the U.S. market, we are increasing our LVT production and sourcing, as LVT continues gaining market share."

297. In the July 25, 2018 Press Release, Defendant Lorberbaum further touted slight improvements in the performance of the Flooring North America Segment: "[S]ales increased 2% . . . Our LVT sales in the period grew less than we forecast due to a delay in shipments of our sourced products. We anticipate a significant increase in LVT sales as our new U.S. production ramps up and the supply of sourced products increases in the third period."

298. Defendants' statements in the July 25, 2018 Press Release were false and misleading because Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS.

299. The day after Mohawk filed the July 25, 2018 Press Release with the SEC, Mohawk hosted a conference call for investors ("July 26, 2018 Earnings Call"). On that call, CFO Boykin stated once again that LVT manufacturing could not keep pace with LVT sales: "During the period, our U.S. LVT sales growth was limited by capacity constraints."

107

300. On the same July 26, 2018 Earnings Call, CFO Boykin attributed Mohawk's rising inventories and slow inventory turnover to benign macroeconomic forces, namely "inflation negatively impact[ing] the [inventory days] calculation.

301. The statements in the July 26, 2018 Earnings Call were false and misleading for the same reasons that the statements in the July 25, 2018 Press Release were false leading, namely that Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS.

302. On August 3, 2018, Mohawk filed its Form 10-Q Quarterly Report ("2Q2018 10-Q") with the SEC for the second quarter of 2018.  The 2Q2018 10-Q repeated the same false financial results reported in the July 25, 2018 Press Release and on the July 26, 2018 Earnings Call.

303. Moreover, Mohawk attributed the change in its financial reports—with respect to both EPS and operating income—to legitimate business reasons:

> The decrease in EPS was primarily attributable to higher inflation and startup costs, increased income tax expense, and decreased sales volume . . . .
>
> The decrease in operating income was primarily attributable to higher inflation costs of approximately $62 million, including increased

108

material costs of approximately $34 million, and approximately $8 million of startup costs associated with large investments to expand sales, add product categories, and enter new markets . . . .

304. The 2Q2018 10-Q likewise explained that 2018 second quarter sales in the Flooring North America Segment were higher than in second quarter of 2017. Mohawk explained that this increase could be attributed "primarily" to "the favorable net impact of price and product mix and higher sales volume."

305. In truth, the Company had mitigated its decrease in EPS by, in part, pulling in sales from future periods by channel stuffing and the Saturday Scheme, overproducing product to drive down COGS, and refusing to write down defective inventory.  Had Mohawk properly accounted for revenues and inventory, it would not have achieved the net earnings gains it boasted of.

306. Finally, the 2Q2018 10-Q misrepresented the company's practices concerning updates to its revenue and inventory accounting methods.  *First*, the 2Q2018 10-Q told investors that Mohawk had adopted ASU 2015-11, Simplifying the Measurement of Inventory, and that the "update did not have a material impact on the Company's consolidated financial statements."

307. *Second*, the 2Q2018 10-Q assured investors that the company would adopt provisions of the new accounting standard outlined in ASC 606 concerning revenue from contracts with customers.

308. In truth, the Company recognized revenue on product shipped prematurely and without the customers' consent (*i.e.*, without the existence of an arrangement), and which oftentimes was not delivered but returned to the Company's distribution centers, in violation of applicable accounting rules and ASC 606.

## H.    2018: Third Quarter

309. In Press Release filed with the SEC on October 25, 2018 ("Oct. 25, 2018 Press Release"), Mohawk made the following statements approved by Lorberbaum and Boykin:

> Mohawk Industries, Inc. (NYSE: MHK) today announced 2018 third quarter net earnings of $227 million and diluted earnings per share (EPS) of $3.02. Adjusted net earnings were $246 million and EPS was $3.29, excluding restructuring, acquisition and other charges, a 12% decrease from last year. Net sales for the third quarter of 2018 were $2.5 billion, up 4% in the quarter and 5% on a constant currency basis. For the third quarter of 2017, net sales were $2.4 billion, net earnings were $270 million and EPS was $3.61; adjusted net earnings were $281 million, and EPS was $3.75, excluding restructuring, acquisition and other charges.

310. The same Press Release report quotes Defendant Lorberbaum acknowledging that the Company's performance did not meet expectations, but in his explanation, he noted "additional manufacturing reductions were required during the period to control our inventory levels.  Our LVT sales were up significantly but were still constrained by internal production."

311. Defendants' statements in the July 25, 2018 Press Release were false and misleading because Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS.

312. The day after filing the Oct. 25, 2018 Press Release with the SEC, Mohawk held a conference call for investors ("Oct. 26, 2018 Earnings Call").  On that call, Defendant Lorberbaum faced pressure from investors for Mohawks high levels of inventory.  Defendant Lorberbaum explained that inventory turns got "worse because the raw materials have increased, and it's showing up in the inventory dollars, in addition to having nothing to do with the units as the prices go up."  Defendants also stated that inventory problems could be attributable to "inflation and backwards integration."

313. Defendants' statements in the Oct. 26, 2018 Earnings Call were false and misleading for the same reasons that the statements in the Oct. 25, 2018 Press Release were false and misleading, namely that Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the

overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS.

314. On November 2, 2018, Mohawk filed its form 10-Q Quarterly Report ("3Q2018 10-Q") with the SEC for the third quarter of 2018.  The 3Q2018 10-Q repeated the same false financial results reported in the Oct. 25, 2018 Press Release and the Oct. 26, 2018 Earnings Call.

315. Moreover, Mohawk attributed its financial results – with respect to both EPS and operating income – to legitimate business reasons:

> The decrease in EPS was primarily attributable to higher inflation, higher start-up costs, and costs due to temporarily reducing production, partially offset by decreased income tax expense, the favorable net impact of price and product mix, increased sales volume and savings from capital investments and cost reduction initiatives. The increase in sales volume is primarily due to the acquisitions. . . .

> The decrease in operating income was primarily attributable to higher inflation costs of approximately $69 million, including increased material costs of approximately $37 million and increased North American freight costs of approximately $12 million, approximately $14 million of start-up costs associated with large investments to expand sales, add product categories, and enter new markets . . . approximately $9 million of costs due to temporarily reducing production . . . partially offset by increased sales volume of approximately $17 million.

316. The 3Q2018 10-Q likewise identified increases in sales and operating earnings in the Flooring North America Segment.  It attributed those modest decreases to legitimate business reasons, "primarily" to "the favorable net impact of price and product mix and higher sales volume."

317. In truth, the modest decreases in EPS had been mitigated, in part, by pulling in sales from future periods by channel stuffing and the Saturday Scheme, overproducing product to drive down COGS, and refusing to write down defective inventory.  Had Mohawk properly accounted for revenues and inventory, it would not have achieved the net earnings gains it boasted of.

318. Finally, the 3Q2018 10-Q misrepresented the company's practices concerning updates to its revenue and inventory accounting methods.  *First*, the 3Q2018 10-Q told investors that Mohawk had adopted ASU 2015-11, Simplifying the Measurement of Inventory, and that the "update did not have a material impact on the Company's consolidated financial statements."

319. *Second*, the 3Q2018 10-Q assured investors that the company would adopt provisions of the new accounting standard outlined in ASC 606 concerning revenue from contracts with customers.  The 3Q2018 10-Q further added: "At this time ASC 606 is not expected to have a material impact on the amounts reported in the Company's consolidated financial position, results of operations or cash flows."

### I.     2018: Fourth Quarter and Full Year

320. In a Press Release Current Report filed with the SEC on February 7, 2019 ("February 7, 2019 Press Release"), Mohawk made the following statements approved by Lorberbaum and Boykin:

Mohawk Industries, Inc. (NYSE: MHK) today announced 2018 fourth quarter net earnings of $229 million and diluted earnings per share (EPS) of $3.05. Adjusted net earnings were $188 million and EPS was $2.53, excluding restructuring, acquisition and other charges, a 26% decrease from last year. Net sales for the fourth quarter of 2018 were $2.45 billion, up 3% in the quarter and 5% on a constant currency basis. For the fourth quarter of 2017, net sales were $2.37 billion, net earnings were $240 million and EPS was $3.21; adjusted net earnings were $256 million, and EPS was $3.42, excluding restructuring, acquisition and other charges.

321. Defendants' statements in the February 7, 2019 Press Release were false and misleading because Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS.

322. The same Press Release quotes Defendant Lorberbaum acknowledging that the Company missed expectations: "[t]he period was affected by significant inflation, slowing markets and LVT impacting sales of other products. Even as we executed price increases in many products, our businesses experienced greater pressures on pricing and mix. In the quarter, inflation continued to be a headwind across most of our categories, as higher cost materials flowed through our results."

323. The day after filing the February 7, 2019 Press Release with the SEC, Mohawk held a conference call for investors ("February 8, 2019 Earnings Call").

On that call, Defendant Lorberbaum repeated the financial information reported in the 8-K the previous day.

324. On the same call, Lorberbaum acknowledged rising inventory but attributed that rise in inventory to legitimate business reasons, including "new businesses and acquisitions," as well as "Chinese prebuy and inflation."

325. On the February 8, 2019 call, investors pressed Lorberbaum for explanations about the rising levels of inventory. Lorberbaum provided the following response:

> [W]e are raising the inventories for all the reasons you just went through. In some cases, we're buying it ahead because of the pricing. In some cases, we're buying it ahead because of the increases. And in some cases, we're buying it ahead to expand our business and footprint and brands we're selling under in each cases. So it's all of the above. I would imagine the rest of the world is doing the same thing.

326. Investors pressed on, this time asking about the reason for higher levels of inventory in LVT specifically. Lorberbaum responded:

> First is that, I assume you know that the Chinese have a down period in the first of the year, so you have to prebuy ahead of it. The second is we are expecting our sales to go up, so we're building inventories for those product categories before we have any sales. And you have to build enough so you can satisfy the customers. Third is the inventory is also going into all these newbusinesses we go keep talking about. When you start them up, you putin all the raw materials, the inventories and you're building newproducts before the sales in those too, so the inventories are all there.

327. The statements made on the February 8, 2019 call were misleading for the same reasons that the statements made in the February 7, 2019 Press Release was misleading.

328. Later in February, on February 28, the Company filed its 10-K for 2018 ("2018 10-K") with the SEC. The 2018 10-K repeated the same financial information as the February 7, 2019 Press Release.

329. Also in the 2018 10-K, Mohawk attributed its sales solely to legitimate business factors, reporting that "[t]he increase was primarily attributable to higher sales volume of approximately $297 million, or 3%, which includes sales volumes attributable to acquisitions of approximately $229 million and legacy sales volumes of approximately $68 million, the favorable net impact of price and product mix of approximately $111 million, or 1%, and the favorable net impact of foreign exchange rates of approximately $85 million, or 1%." Mohawk also attributed Flooring North America's sales solely to legitimate business factors: "[t]he increase was primarily attributable to the favorable net impact of price and product mix of $51 million, or 1%."

330. In truth, the Company had increased sales by, in part, pulling them in from future periods by channel stuffing and the Saturday Scheme, overproducing product to drive down COGS, and refusing to write down defective inventory over

the previous years.  Had Mohawk properly accounted for revenues and inventory, it would not have achieved the net earnings gains it boasted of.

331. Finally, the 2018 10-K made additional misrepresentations about Mohawk's accounting methods.  *First*, the 2018 10-K defined revenue: "Revenues are recognized when there is persuasive evidence of an arrangement, delivery has occurred, the price has been fixed or is determinable, and collectability can be reasonably assured."  *Second*, the 2016 10-K defined inventory: "Inventories are stated at the lower of cost or market (net realizable value). . . .  Market, with respect to all inventories, is replacement cost or net realizable value.

332. In truth, the Company recognized revenue on product shipped prematurely and without the customers' consent (*i.e.*, without the existence of an arrangement), and which oftentimes was not delivered but returned to the Company's distribution centers, in violation of applicable accounting rules and ASC 606.

## VII.  RELIANCE

333. During the Relevant Period, Plaintiffs relied upon the materially false and misleading statements alleged herein when purchasing Mohawk stock. Plaintiffs relied on the materially false and misleading statements in several ways.

334. As an initial matter, they relied by virtue of the fraud-on-the-market presumption because (i) Defendants made public misrepresentations or failed to

disclose material facts during the Relevant Period; (ii) the misrepresentations and omissions were material; (iii) the Company's stock traded in an efficient market; (iv) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and (v) Plaintiffs purchased Mohawk stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed without knowledge of the misrepresented or omitted facts.

335. At all relevant times, the market for Mohawk's publicly-traded common stock was efficient for the following reasons, among others:

a.    Mohawk common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.    As a regulated issuer, Mohawk filed regular reports with the SEC;

c.    Mohawk regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.    Mohawk was regularly followed by numerous securities analysts

employed by major brokerage firms headquartered in the United States and overseas who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Many of these reportswere publicly available and entered the public marketplace;

e.      The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Mohawk's securities; and

f.      Without knowledge of the misrepresented or omitted facts, Plaintiffs purchased or otherwise acquired Mohawk common stock between the time that Defendants made the material misrepresentations and omissions and thetime that the relevant truth concerning Mohawk's financial condition was revealed, during which time the price of Mohawk common stock was artificially inflated by the Defendants' misrepresentations and omissions.

336. As a result of the foregoing, the market for Mohawk common stock promptly reacted to current information regarding Mohawk from publicly available sources and reflected such information in the trading price of Mohawk common stock. Under these circumstances, a presumption of reliance applies pursuant to the fraud-on-the-market doctrine.

337. Plaintiffs are also entitled to the presumption of reliance established by the *Affiliated Ute* doctrine as Defendants failed to disclose material known facts to the market.

338. Further, Plaintiffs actually relied on Defendants' misrepresentations and material omissions when deciding whether to purchase Mohawk stock.

339. During the Relevant Period, Plaintiffs' investments were managed by their investment advisor, Hound Partners, LLC ("Hound"), which utilized an active strategy based on an analytical research-based investment process. Hound's analysts, in conjunction with Hound's Managing Member, made the decisions whether to purchase, sell, or hold shares of Mohawk stock. As part of the active investment strategy, Hound regularly reviewed and analyzed Defendants' public statements, including Defendants' misrepresentations, when making the investment decisions on behalf of Plaintiffs.

340. Specifically, Hound read and relied on the Company's financial statements, the Company's SEC disclosures concerning its internal controls, financial reporting and statements regarding Mohawk's sales of LVT, inventory and inventory valuations, LVT production, and the cause of the Company's increasing revenue and earnings

341. In addition, Hound reviewed and analyzed additional statements made regarding the Company's revenues, growth, margins, earnings, and LVT business made by Defendants on earnings calls and during meetings with Hound.

342. For example, Hound reviewed Defendants' statements on the Q1 2017 earnings call regarding its growth and margins.  Similarly, Hound reviewed Mohawk's historical reported revenues and earnings—both of which had been inflated by Mohawk's undisclosed schemes.  Hound concluded—relying on Defendants' materially false statements and omissions—that Mohawk had strong margins that would continue to widen as the company continued what appeared to be a virtuous cycle of reinvesting in its business.  Hound similarly noted that the Company had consistently increased its profitability.  Following this analysis, and the review of Mohawk's SEC filings, Hound initiated Plaintiffs' position in Mohawk.

343. Hound's analysis continued after its initial investment in Hound. Shortly after its initial investment, Hound analyzed Mohawk's Q2 2017 results on July 27, 2017, noting that it reflected a "healthy quarter" that included margin expansion.  Hound further listened to and analyzed Mohawk's Q2 2017 earnings call on July 28, 2017.  Hound specifically noted, among other things, Defendants' statements regarding Mohawk's growing LVT business, strong margins, and the fact that Mohawk delivered strong growth despite its capacity constraints.  Hound

also noted Defendants' false explanations for Mohawk's inventory growth, including the higher raw material costs and the expansion into other businesses. Relying on this information, as well as the information considered and relied upon in connection with the initiation of Plaintiffs' position in Mohawk, Hound purchased additional shares of Mohawk on behalf of Plaintiffs.

344. Following the earnings call, Hound had a meeting with Defendants Lorberbaum and Boykin on August 10, 2017, where they reiterated many of the same false and misleading misrepresentations and omissions they had made publicly and Hound had relied upon in purchasing Mohawk stock. For example, Defendant Lorberbaum reiterated the purported competitive advantage Mohawk had over its competitors, which, according to Lorberbaum, was driving the "record margins" Mohawk was purportedly achieving. He, of course, did not disclose that the actual cause of the "record margins" was the intentional overproduction of product and the refusal to write down the defective LVT. Further, he represented that Mohawk's growth between 2011 through 2016 was stymied by capacity constraints, and that growth would have been even higher absent the capacity constraints, particularly in the LVT business. Lorberbaum also stated that today he has LVT plants with the highest speed machinery in the world and expected to sell out of all of the LVT capacity Mohawk was adding. He, of course, did not disclose that the issues with the LVT product was not capacity but quality.

345. Relying on this confirmatory information as well as the false and misleading representations from the Q1 2017 and Q2 2017 earnings calls and earnings releases, Hound purchased more shares of Mohawk stock on behalf of Plaintiffs.  By September 14, 2017, Hound had purchased over $160 million of Mohawk stock on behalf of Plaintiffs.

346. On September 14, 2017, Hound had a call with Defendant Boykin in which Boykin reiterated and magnified numerous misrepresentations that Hound had relied upon in connection with the prior purchases of Mohawk stock.  For example, he claimed that but for Mohawk's purported "capacity constraints," Mohawk's earnings in 2016 would have been higher because Mohawk could have sold a lot more LVT.  He further claimed that Mohawk expected margins to expand further, something that was obviously unattainable absent the continuation of Defendants' undisclosed schemes.

347. Following the September 14, 2017 meeting with Defendant Boykin, Hound—relying on the information from that meeting as well as the other information previously relied upon—Hound purchased more Mohawk stock on behalf of Plaintiffs.

348. Hound continued to analyze and monitor Mohawk's disclosures throughout the Relevant Period and continued to rely upon those disclosures—

including the false and misleading misrepresentations and omissions—when making investment decision on behalf of Plaintiffs.

349. For example, on February 8, 2018, Hound reviewed Mohawk's Q4 2017 results and determined that they were strongly beating the market's consensus for earnings per share.  Of course, Hound's analysis did not have the benefit of knowing that the strong results were the product of Mohawk's schemes.  Relying on, among other things, Mohawk's Q4 2017 results as well as the prior information Hound had relied upon, Hound purchased more Mohawk shares on behalf of Plaintiffs.

350. Similarly, on March 10, 2018, Hound had a meeting with Defendants Lorberbaum and Boykin to discuss, among other things, Mohawk's 2017 results. During that meeting, Defendants continued to reiterate the same false and misleading misrepresentations and omissions that Hound had relied on and would continue to rely upon.  For example, Lorberbaum continued to claim that Mohawk was capacity constrained on LVT, which is why it was not growing.  Lorberbaum and Boykin similarly continued to tout their LVT factories as a competitive advantage going forward and claimed that Mohawk's competitors were "[y]ears behind" Mohawk in terms of producing a quality and affordable product.

351. Continuing to rely on Defendants' consistent misrepresentations, Hound purchased more Mohawk stock on behalf of Plaintiffs as Hound concluded,

among other things, that organic growth and margin expansion would accelerate as the capacity investments kicked in.  Of course, Hound was unaware that Mohawk was not experiencing capacity constraints.  In fact, Mohawk had excess capacity due to its scheme to manipulate margins and earnings.  In addition, Hound was unaware that Mohawk's prior results had been propped up by the Saturday Scheme.

## VIII.  LOSS CAUSATION

352. The price of Mohawk common shares purchased by Plaintiffs was artificially inflated by the material misstatements and omissions alleged herein, including the false and misleading statements regarding Mohawk's revenues, earnings, inventories, and LVT quality and sales. *See* Sections V, VI.

353. Defendants had repeatedly lied about Mohawk's true financial condition throughout 2017 and 2018, leading to an artificially inflated share price during this period.

354. Plaintiffs began purchasing Mohawk shares on July 21, 2017, after Mohawk's lies had impacted the price of Mohawk's securities, but before the truth about Mohawk came to light.  Plaintiffs continued purchasing Mohawk shares through April 2018, when it held approximately 1.43 million Mohawk shares – all purchased at inflated prices.

355. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the relevant period, Plaintiffs would not have

purchased Mohawk's securities or would not have purchased Mohawk securities at the artificially inflated prices that they paid.

356. Defendants made their first partial disclosure of the Company's true financial condition on July 26, 2018.  As a result, on that day, the price for Mohawk's publicly traded shares declined by $38.06 per share on heavy volume, representing a fall of 18%.  Plaintiffs collectively held over 800,000 shares of Mohawk stock on that day, all purchased after July 2017.

357. Defendants made their second partial disclosure of the Company's true financial condition on October 26, 2018.  As a result, on that day, the price for Mohawk's publicly traded shares declined by $36.04 per share on heavy volume, representing a fall of an additional 24%.

358. It was foreseeable that, after Defendants' fraudulent scheme and misleading statements caused Mohawk's stock price to trade at artificially inflated prices, Mohawk's stock price would decline when the Company's true financial condition was revealed to investors.  It was also foreseeable that such a decline in the stock price would harm Plaintiffs.

359. As a direct and proximate result of Defendants' material misrepresentations, omissions and conduct alleged herein, Plaintiffs purchased Mohawk common stock at prices far exceeding its true worth.  Mohawk shareholders, including Plaintiffs, were injured when the scheme was partially

revealed by Mohawk's failure to be able to maintain the unsustainable practice of pulling in future sales and hiding an ever-more increasing level of inventory of defective LVT (and other products).

360. The timing and magnitude of the declines in Mohawk's share price negate any inference that Plaintiffs' losses were caused by some other intervening event unrelated to Defendants' false and misleading statements, such as changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

## IX.   ADDITIONAL SCIENTER ALLEGATIONS

361. Throughout the relevant period, Defendants produced a poor quality LVT product, allowed useless product to pile up in inventory, and engaged in channel-stuffing to give the illusion of high sales in each quarter.  Meanwhile, Defendants told the public that Mohawk was profitable as ever.

362. Thus, Defendants' misled Plaintiffs and the investing public with respect to (1) the quality of LVT produced at the Dalton Plant, (2) the amount of scrap inventory piling up in Mohawk's warehouses, (3) the salability of the LVT that Mohawk shipped to customers, (4) the validity of reported sales of LVT, (5) the company's profitability and margins with respect to LVT, and (6) the strength of the Company's internal controls.

363. Defendants therefore had the intent to deceive investors when they reported on the health of the business during the relevant period from July 2017 until April 2019.

364. The following facts support a strong inference of scienter for each of Lorberbaum, Boykin, and Carson.

365. *First, Defendant Carson and his Deputies Orchestrated the Fraudulent Schemes*.  Of Mohawk's various divisions, the frauds known to Plaintiffs are all concentrated in the Flooring North America Division, and in particular in the LVT and carpet divisions.

366. Two of Defendant Carson's key deputies – Jeremy Tatum and Dan Flowers – were the ones to give the explicit orders to carry out the Saturday Scheme.  And Carson himself directly reported to Lorberbaum on all matters.

367. *Second, Executives at Mohawk Knew of the Problems with the LVT Coming Out of the Dalton Plant.*  CW4 and CW5 both independently remarked that employees at the Dalton Plant constantly complained of poor morale and safety concerns.   The result of these workforce problems was a poor manufacturing output.

368. This was not the type of flaw that could be overlooked by anyone, much less experienced experts in flooring, like Defendants.  The individual LVT tiles noticeably varied in height, and would not lay flat.  After installation at Mohawk's

headquarters, the LVT peeled up visibly.  Executives, including Defendants, would have had to step over their own defective product before arriving at the office each morning.

369. Moreover, the scope of the inventory crisis was so large that it necessitates Defendants' knowledge and tacit approval.  CW6 described that LVT inventory grew nearly threefold, from 36 million square feet to 90 million square feet.  Expenses into the millions of dollars were incurred just to accommodate the scrap LVT – including renting hundreds of thousands of feet of warehouse space and at least 100 empty trailers.

370. *Third, Mohawk Commissioned the G3 Team to Evaluate Problems with LVT.*  CW1 reported that the G3 team met weekly with a mandate from management to discover how to improve LVT sales.  The G3 team instead discovered that warehouse staff engaged in channel stuffing that inflated the amount of LVT that Mohawk appeared to sell each quarter.

371. *Fourth, Poor LVT Soured Key Customer Relationships.*  Mohawk's customers were frustrated by the poor quality of LVT coming from the Dalton Plant and from Mohawk generally.

372. CW1 reported that Home Depot – among Mohawk's biggest clients – was one of the most frustrated.  Home Depot representatives met with CW1 and

other senior Mohawk executives at least quarterly to discuss the business relationship.

373. Account managers for smaller customers corroborated this account. For instance, CW3 and CW8 indicated that they lost many of accounts because customers were consistently dissatisfied with the product they received.

374. *Fifth, the Individual Defendants Saw LVT Production as a Key Element of Their Long-Term Business Strategy.* Lorberbaum, Boykin, and Carson were aware and reported to investors the growing popularity of LVT flooring as early as 2015, before Mohawk acquired the IVT Dalton Plant. In Defendants' eyes, competing in the LVT market would be essential to the success of the company, as Defendants recognized the general trend toward LVT among American consumers.

375. Moreover, the Dalton LVT Plant was an expensive acquisition, costing nearly $1.2 billion to acquire. Thus, it makes intuitive sense that Lorberbaum kept a close eye on the Dalton Plant and its profitability. Indeed, per the Class Complaint, FE11 reported that Lorberbaum changed FE11's boss—the overseer of the Dalton Plant—five times in two years. The high level of employee turnover is also corroborated by CW4.

376. *Sixth*, *Lorberbaum Approved Steeply Discounted Prices for LVT.* In 2017 and 2018, Mohawk authorized the sale of a million square feet of defective LVT for only $0.99 per square foot, down from the standard price of $2.50.

377. The only justification for such a steep discount, especially with high and growing consumer demand for LVT, was poor quality.

378. *Seventh, Lorberbaum and Senior Managers Received Weekly Inventory Reports.* CW6 reported that Mohawk created weekly inventory reports every Monday showing that Mohawk carried massive amounts of LVT in storage. Defendants either knowingly or recklessly disregarded that the inventory reports were different from the Company's public financial statements.

379. Moreover, it was Mohawk policy that senior executives were to monitor inventory controls. Prior to the relevant period, on November 10, 2016, the Company admitted it had been caught by the Public Company Accounting Oversight Board not implementing proper internal controls "related to documenting management's inventory control oversight." And, to address this, Mohawk had created "policies that require specific monitoring" of its inventory levels by senior management.

380. *Eighth, Defendants Received Direct Reports of the Saturday Scheme.* According to CW12, among others, Mohawk's C-level senior executives (including CEO Lorberbaum and CFO Boykin) received regular reports of sales activities showing spikes in sales on the last day of each quarter. These reports evidenced Mohawk's efforts to ship product at the end of a quarter to meet financial targets, and showed a "huge spike" in sales.

381. *Ninth, Mohawk Provided Top-Down Pressure to Improve Sales.* CW6 and CW10 reported that the Saturday Scheme was part of an organized effort on the part of the Flooring North America segment to meet high earnings expectations. In a facetious but illustrative nod to political graft, Defendant Carson described this as the quarterly effort to "drain the swamp."

382. *Tenth, Lorberbaum Dismissed Carson When the Scheme Came to Light.* Mohawk effectively fired Defendant Carson in November 2018, shortly after the Company's stock price plunged and Mohawk was force to reveal the true financial condition of the Company was not what had been previously represented to investors.

383. Mohawk issued a public press release announcing that "Brian Carson, former president of the Company's Flooring North America segment, will leave the Company on November 12, 2018 to pursue other interests."

384. Mohawk's announcements of executive departures typically thanked the executive for his/her time at the Company. The fact that Mohawk did not thank Carson, and the timing of Carson's departure, support a strong inference that Mohawk fired Carson for cause and as a result of Carson's role in the fraudulent scheme alleged herein.

## X.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

385. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading concerned statements of existing or historical fact or conditions. To the extent that any of the statements alleged to be false and misleading may be deemed to be forward-looking statements, Defendants are nevertheless liable for those statements because they were not identified as forward-looking statements. Even if the statements were identified as forward-looking, the statements were material and were not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements and, at the time each of those statements was made, Defendants had actual knowledge that the particular forward-looking statement was false or the forward-looking statement was authorized and/or approved by an officer of Mohawk who knew that the statement was false when made. Further, to the extent that any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements that later became inaccurate and/or did not disclose information that undermined the validity of those statements.

## XI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Against Mohawk, Lorberbaum, Boykin, and Carson for Violations of §10(b) of the Exchange Act and SEC Rule 10b-5

386. Plaintiffs incorporate each and every allegation contained above as if fully set forth herein.

387. Defendants along with other Mohawk employees, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Mohawk, as specified herein.

388. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit in an effort to maintain an artificially high market price for Mohawk common stock in violation of §10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

389. Defendants: (i) deceived the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflated and maintained the market price of

Mohawk's common stock; and (iii) caused Plaintiffs to purchase Mohawk shares at artificially inflated prices.

390. The Individual Defendants' primary liability, and controlling person liability, arise from the following facts: (i) each was a high-level executive and/or director at the Company; (ii) each, by virtue of his or her responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial performance, projections and/or reports; and (iii) each was aware of the Company's dissemination of information to the investing public, which each knew or disregarded with severe recklessness was materially false and misleading.

391. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Mohawk's publicly disseminated information. The Individual Defendants were provided with copies of the Company's reports, press releases and documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

392. Defendants had actual knowledge of the misrepresentations and omissions of material facts alleged herein, or acted with reckless disregard for the truth by failing to ascertain and disclose such facts, even though such facts were available. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Mohawk's adverse operating condition and financial condition, including its efforts to manipulate reported financial results by pulling in sales from future quarters, conceal problems with manufacturing of LVT, refusal to write down excess inventory, and over-production of carpet and LVT to drive down COGS, from the investing public and supporting the artificially inflated price of its securities. As alleged herein, Defendants had actual knowledge of the misrepresentations and omissions alleged, or were reckless in failing to obtain such knowledge by deliberately refraining from discovering whether their statements were false or misleading.

393. As a result of the fraudulent activities of Defendants described above, the market price of Mohawk common stock was artificially inflated. In ignorance of the fact that the market price of Mohawk common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which Mohawk common stock traded at the time when such statements were made, Plaintiffs acquired Mohawk

common at artificially high prices and were damaged thereby, as evidenced by, among other factors, the stock price declines identified herein that released the artificial inflation from Mohawk common stock.  At the time of the alleged misrepresentations and omissions, Plaintiffs were unaware of their falsity, and believed the false statements to be true.  Had Plaintiffs known the true nature of the operations of Mohawk and of the Company's failure to disclose its true financial condition, Plaintiffs would not have purchased or otherwise acquired Mohawk common stock.

394. Plaintiffs are entitled to the presumption of reliance established by the fraud-on-the-market doctrine for publicly traded Mohawk common stock. At all times relevant to this Complaint, the market for Mohawk common stock was an efficient market.  Mohawk common stock was listed and actively traded on a highly efficient and automated market; Mohawk filed periodic public reports with the SEC; Mohawk was followed by numerous securities analysts employed by leading brokerage firms and investment banks who wrote reports about the Company; and, Mohawk regularly issued press releases, which were carried by national and international news wires, and which were publicly available and entered into the public marketplace.  As a result, the market for Mohawk equity securities promptly digested current information regarding Mohawk from all publicly available sources and reflected such information in Mohawk's stock price.

395. Plaintiffs can also establish actual reliance.  Plaintiffs actually read (and/or listened to) and relied upon Defendants' false and misleading statements as set forth herein, and as detailed in Section VII.

396. Plaintiffs are also entitled to the presumption of reliance established by the *Affiliated Ute* doctrine as Defendants failed to disclose to investors material facts known to the Defendants concerning Mohawk's efforts to manipulate reported financial results by pulling in sales from future quarters, conceal problems with manufacturing of LVT, refusal to write down excess inventory, and over-production of carpet and LVT to drive down COGS.

397. The market prices for Mohawk common stock declined materially upon the various public disclosures of the Company's true financial condition and the true facts that had been misrepresented or concealed as alleged herein.

398. As a direct and proximate result of the alleged wrongful conduct, Plaintiffs suffered damages in connection with their purchase of Mohawk common stock.

399. By virtue of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## SECOND CAUSE OF ACTION

### Against Mohawk, Lorberbaum, Boykin, and Carson for Violations of §18 of the Exchange Act

400. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly. For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

401. This claim is asserted against Defendants for violations of §18 of the Exchange Act.

402. As set forth above, Defendants made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC by Mohawk, including the Company's filings on Forms 8-K, 10-K and 10-Q during the relevant period. Specifically, Plaintiffs read and relied on the Company's financial statements, the Company's disclosures concerning its internal controls, financial reporting and statements regarding Mohawk's sales of LVT, inventory and inventory valuations, LVT production, and the cause of the Company's increasing revenue and earnings.

403. Plaintiffs read and relied upon statements in the Company's SEC filings concerning Mohawk's financial statements being materially complete and not

omitting material information. Plaintiffs read and relied upon disclosures that Defendants purportedly implemented appropriate internal controls over accounting and utilized independent committees to oversee business governance and compensation. Plaintiffs and/or their agents relied on these SEC filings not knowing that they were false and misleading.

404. The reliance by Plaintiffs and/or their agents was reasonable.

405. When the truth began to emerge about the false and misleading statements and omissions in the Company's documents and reports filed with the SEC, Plaintiffs were significantly damaged by the resulting drop in the value of Mohawk common stock.

406. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damage in connection with their purchases of Mohawk common stock.

407. By virtue of the foregoing, Defendants violated §18 of the Exchange Act.

## THIRD CAUSE OF ACTION

### Against Defendants Lorberbaum, Boykin, and Carson for Violations of §20(a) of the Exchange Act

408. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

409. By virtue of the foregoing, Defendants violated §18 of the Exchange Act.

410. During the relevant period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Mohawk's business affairs. Because of the Individual Defendants' senior positions, they knew the adverse non-public information about Mohawk's efforts to manipulate reported financial results by pulling in sales from future quarters, conceal problems with manufacturing of LVT, refusal to write down excess inventory, and over-production of carpet and LVT to drive down COGS.

411. As officers of a publicly owned company, the Individual Defendants had a duty to disseminate complete, accurate and truthful information with respect to Mohawk's financial condition and results of operations, and to correct promptly any public statements issued by Mohawk which had become materially false or misleading.

412. Because of the Individual Defendants' positions of control and authority as senior officers of Mohawk, they were able to, and did, control the contents of the various reports, press releases and public filings which Mohawk disseminated in the marketplace during the relevant period. Throughout the relevant period, the Individual Defendants exercised power and authority to cause Mohawk

to engage in the wrongful acts complained herein.  The Individual Defendants, therefore, were each a "controlling person" of Mohawk within the meaning of §20(a) of the Exchange Act.  In this capacity, the Individual Defendants participated in the unlawful conduct alleged which artificially inflated the market price of Mohawk common stock.

413. By reason of the above conduct, the Individual Defendants are each jointly and severally liable pursuant to §20(a) of the Exchange Act for Mohawk's primary violations of the Exchange Act as alleged herein.

## FOURTH CAUSE OF ACTION

### Against All Defendants for Common Law Fraud

414. Plaintiffs incorporate by reference e each and every allegation contained above as if fully set forth herein.

415. This claim is asserted against all Defendants based on common law principles of fraud and conspiracy.

416. Defendants made, authorized or caused to be made numerous false representations of material fact to induce Plaintiffs to purchase Mohawk's common stock.

417. Defendants made numerous material misrepresentations or omitted facts about Mohawk's end-of-quarter sales, by which Mohawk brought forward sales at the end of each financial quarter to manipulate the timing of its sales and

give the appearance that such sales took place in the respective quarters when the revenue was improperly recognized in violation of generally accepted accounting principles and Mohawk's own policies.

418. In addition, Defendants made numerous material misrepresentations or omitted facts about the quality of Mohawk's LVT production, including by fraudulently representing that Mohawk's sales of LVT were limited only by their capacity constraints and covering up the fact that its US-based LVT production was defective.

419. Defendants also covered up and failed to disclose the fact that large sums of waste was placed into Mohawk's inventory rather than written off and properly disposed of, thus having the effect of bloating Mohawk's inventory while artificially improving its profit margins by reducing the unit costs of manufacturing and thereby appearing to inflate its profits.

420. Defendants also made numerous material misrepresentations or omitted material facts about its inventory levels and profit margins by failing to disclose that Mohawk was directing production overruns of excess product, which had the intended effect of appearing to drive down the costs to manufacture each product by spreading the Company's fixed manufacturing costs across more products.

421. Defendants' schemes were intended to, and did, have the desired effect of helping Mohawk meet analysts' financial projections and avoid an earnings miss that would cause Mohawk's stock price to decline.

422. Defendants knew that these statements were false when made or omitted material facts, or at the very least, they made the statements with reckless disregard for their truth.  Each of the Defendants was perpetrating a fraud on Maverick and the market, causing Mohawk's stock to trade at an artificially inflated price.

423. Defendants knew that Hound and other investors would receive and rely on such representations, and intended that their false and/or misleading statements would induce Hound to purchase Mohawk's common stock at inflatedprices.

424. Defendants' misrepresentations were material because they concerned critical and highly scrutinized information regarding Mohawk's operating performance, the accuracy of its reported financial information, and its sales and margins metrics in particular, and its internal controls over financial reporting as well as its disclosures controls and procedures.  Defendants' statements were also material because they were important to the quality of management, the integrity of the Company's senior managers, the adequacy and effectiveness of financial controls, and the overall financial performance of the Company.

425. Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions.  Hound would not have purchased Mohawk's common stock at all, or at the prices Hound paid, had Hound known the true facts regarding Defendants' various schemes.

426. In addition, Plaintiffs were induced by Defendants to forebear from selling their Mohawk stock, based on the misrepresentations that were directed to it to its injury.   Plaintiffs specifically and actually relied on those misrepresentations in remaining holders of Mohawk stock.

427. As a direct and proximate result of such reliance, and Defendants' fraudulent statements and omissions of material fact and unlawful misconduct, Plaintiffs have suffered damages, in an amount to be proven at trial.

428. In committing fraud, Defendants have acted in bad faith and are thereby liable for Plaintiffs' attorney's fees and litigation expenses pursuant to O.C.G.A. § 13-6-11, in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Against All Defendants for Negligent Misrepresentation

429. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except allegations that Defendants made the untrue statements of material facts andomissions intentionally or with extreme reckless disregard for the truth.   For the purposes of this claim, Plaintiffs asserts only

negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

430. By reason of the conduct described herein, Defendants negligently made misrepresentations and/or concealed or failed to disclose material facts about Mohawk's financial performance and business operations, its reported financial information, and internal controls and corporate governance. These false and misleading statements were made by virtue of Defendants' public statements and SEC filings that purported to provide an accurate and honest reporting of Mohawk's business operations and financial condition.

431. In making each of the misstatements set forth herein, Defendants failed to act with the prudence required of a reasonable person in each of their respective positions, and each was otherwise careless and/or reckless in making material statements of fact to Plaintiffs to induce its investment of hundreds of millions of dollars in Mohawk stock.

432. Each of Defendants had a duty of care to, and special relationship with, Plaintiffs.

433. Each Defendant personally induced Plaintiffs' investment in Mohawk by leveraging their senior management positions and their unique knowledge of Mohawk's finances and business operations, due to their access to inside Company

information.  Each Defendant developed a special degree of trust with Plaintiffs in making their investment decision regarding the purchase of Mohawk's stock.

434. Plaintiffs actually read, reviewed and relied on, and were misled by, Defendants' misrepresentations.  Plaintiffs' reliance was reasonable and justifiable under the circumstances, because Plaintiffs were outside investors in Mohawk and without access to nonpublic information and Plaintiffs had no reason to doubt that Defendants were being truthful and forthcoming in making their representations to them.

435. In addition, Plaintiffs were induced by Defendants to forebear from selling their Mohawk stock, based on the misrepresentations that were directed to it to its injury.   Plaintiffs specifically and actually relied on those misrepresentations in remaining holders of Mohawk stock.

436. As a proximate result of Defendants' negligent misrepresentations and omissions, Plaintiffs have been harmed in an amount to be proven at trial.

437. In committing negligent misrepresentation, Defendants have acted in bad faith and are thereby liable for Plaintiffs' attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11, in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

**Against All Defendants for Violations of the Georgia Uniform Securities Act of 2008: Section 110-5-50 et seq.**

438. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

439. Pursuant to O.C.G.A. § 10-5-50, it is unlawful for a person, in connection with the offer, sale or purchase of a security, directly or indirectly: (1) To employ a device, scheme, or artifice to defraud; or (2) To make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it is made, not misleading; or (3) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

440. By their purchase of Mohawk common stock, Plaintiffs purchased a security as defined by O.C.G.A. § 10-5-2(31).

441. As detailed above, Defendants made numerous misrepresentations to Plaintiffs, including false and misleading statements and omissions concerning Mohawk's end-of-quarter sales to meet financial projections, defective LVT produced by the U.S. LVT Plant, and the deliberate production overruns that Mohawk undertook.  Defendants perpetrated these schemes to falsify Mohawk's publicly reported financial results to meet analyst expectations and avoid an earnings miss.

148

442. Defendants made untrue statements of material fact and omitted to state material facts regarding these schemes.  Moreover, because they deployed but failed to disclose these abusive and deceptive practices, Defendants made numerous material misrepresentations or omitted facts about the accuracy and effectiveness of Mohawk's internal controls over financial reporting and corporate governance, as well as Mohawk's disclosure controls and procedures.

443. By their misrepresentations and their fraud and deceit, Defendants engaged in a device, scheme or artifice to fraud, as well as committed acts, engaged in practices and a course of business which is fraudulent, deceptive or manipulative. Defendants' statements were made with scienter in that they were made knowing they were not true – and with respect to omissions, Defendants knew that they omitted material facts – or at the very least, they made the statements with severely reckless disregard for their truth.  Defendants intended to defraud Plaintiffs by their false statements.

339. Plaintiffs relied on the Defendants' misrepresentations and omissions, and Plaintiffs' reliance was justifiable and reasonable.

444. As a direct and proximate result of Defendants' violations of the Georgia Uniform Securities Act, Plaintiffs have suffered economic loss and other damages in an amount to be proven at trial.

445. In their violations of the Georgia Uniform Securities Act, Defendants have acted in bad faith and are thereby liable for Plaintiffs' attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11, in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### Against All Defendants for Violations of Georgia RICO, O.C.G.A. Sections 16-14-4(a) and 16-14-4(b)

446. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

447. Defendants are each "persons" within the meaning of O.C.G.A. § 16-14-4.

448. Defendant Mohawk is an "enterprise" within the meaning of O.C.G.A. § 16-14-3(6), which affects commerce in the State of Georgia and elsewhere.

449. Alternatively, Lorberbaum, Boykin, and Carson, who operated as an "association in fact," comprise an "enterprise" within the meaning of O.C.G.A. § 16-14-3(6), which affects commerce in the State of Georgia and elsewhere. Such "association in fact" is an ongoing organization organized for the purpose of perpetrating an illegal scheme to defraud Plaintiffs. Such an enterprise is controlled by Lorberbaum, Boykin and Carson and regularly carries out its function of perpetrating the fraudulent and illegal schemes of Lorberbaum, Boykin, and Carson. The enterprise existed at all relevant times and still exists.

450. Lorberbaum, Boykin, and Carson are persons who, through a pattern of racketeering activity, acquired and maintained, directly or indirectly, an interest in or control of personal property including monies paid by Plaintiffs for their investments in Mohawk.  Suchpattern of racketeering activity included at least two acts of "racketeering activity," including mail and wire fraud, which is defined as "racketeering activity" under O.C.G.A. § 16-14-3(9)(A)(xxix) and 18 U.S.C. §1961(1).

451. Mohawk has conducted or participated, directly or indirectly, in the conduct of the affairs of an enterprise described in this Complaint through at least two acts of "racketeering activity," including mail and wire fraud, which is defined as "racketeering activity" under O.C.G.A. § 16-14-3(9)(A)(xxix) and 18 U.S.C. § 1961(1).

452. Defendants knowingly, intentionally, and willfully acquired or maintained an interest in funds belonging to Hound, including monies paid by Plaintiffs for their investments in Mohawk, through a pattern of racketeering activity and for the unlawful purpose of defrauding Plaintiffs.  Defendants' enterprise existed for the sole improper purpose of furthering a scheme to defraud, steal, and wrongfully and unlawfully acquire the assets of Plaintiffs and others, and the enterprise continues to carry on efforts to conceal its prior activities against Plaintiffs.

453. Indeed, from at least 2016 and continuing to the present in Georgia and elsewhere, by continuing to keep secret their fraudulent schemes. Defendants have violated (1) Ga. Code §16-14-4(a), through a pattern of racketeering activity, to acquire or maintain, directly or indirectly an interest in, or control of Plaintiffs' personal property, including the monies used to invest in Mohawk common stock; and (2) Ga. Code § 16-14-4(b), by being employed by or associated with an enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

## Multiple Instances of Mail Fraud and Wire Fraud

454. Defendants intentionally and willingly devised and participated in a scheme to defraud Plaintiffs of funds, and knowingly and intentionally engaged in a racketeering act by using the interstate mails, in violation of 18 U.S.C. § 1341, and interstate wires, in violation of 18 U.S.C. § 1343, as integral and essential devices to advance, further, and facilitate that scheme.

455. The discrete acts of racketeering activity of Defendants constitute a pattern of racketeering activity in that they have committed at least two acts of racketeering activity that had the same or similar purposes, results, participants, victims, or methods of commission. The discrete acts of racketeering activity of Lorberbaum, Boykin, and Carson with respect to Mohawk also evidence or demonstrate that they are engaged in a pattern of racketeering activity.

456. Because Defendants unlawfully acquired money through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(a), and because Defendants conducted and/or participated in the affairs of an enterprise through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(b), and because Hound was directly injured by the unlawful conduct of Defendants, the Plaintiffs are entitled to three times the amount of their actual damages, plus attorney's fees, costs, and investigative expenses, plus punitive damages in an amount sufficient to deter Defendants from engaging in similar conduct in the future.

457. As a direct and proximate result of the racketeering activity of Defendants, Plaintiffs have suffered injury to their business and property. For example, and without limitation, Defendants used interstate wires to circulate materially false and misleading information regarding Mohawk's financial performance and business operations to Plaintiffs, which were purposefully misleading and which Plaintiffs justifiably relied on to their detriment.

458. These acts caused Defendants to acquire and maintain an interest in funds belonging to Plaintiffs, including monies paid by Plaintiffs for their investments in Mohawk.

**Theft by Taking and Theft by Deception**

459. Upon information and belief, Defendants engaged in the racketeering act of theft by taking and theft by deception within the meaning of O.C.G.A. §

16-8-2 and O.C.G.A. § 16-8-3.  In particular, as described elsewhere herein, Defendantsunlawfully took and misappropriated certain funds and other property belonging to Hound, including monies paid by Plaintiffs for their investments in Mohawk, with the intention of depriving Hound of the same.  Such taking of property constitutes the crime of theft by taking and theft by deception in violation  of O.C.G.A. § 16-8-2 and O.C.G.A. § 16-8-3 and is an act of racketeering activity within the meaning of O.C.G.A. § 16-14-3(9)(A)(ix).

## Fraud under Georgia Uniform Securities Act of 2008

460. By their acts and omissions alleged herein, and upon information and belief, other acts and omissions, Defendants have committed fraud in connection with an offer, sale and/or purchase of securities to Plaintiffs in violation of the Georgia Uniform Securities Act of 2008, O.C.G.A. § 10-5-1 et seq., as amended, by, among other things, (a) employing one or more device, scheme, or artifice to defraud; (b) making untrue statements of material facts or failing to state material facts necessary to make the statements made, in the light of the circumstances under which made, not misleading; or (c) engaging in an act, practice or course of businessthat operates as a fraud or deceit upon another person.

461. Each act and omission of Defendants in committing securities fraud inviolation of the Georgia Uniform Securities Act of 2008, O.C.G.A. § 10-5-1 *et*

*seq.*, as alleged herein, is an act of racketeering activity within the meaning of O.C.G.A. § 16-14-3(9)(A)(xxi), and collectively said acts and omissions constitute a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8).

462. As alleged herein, Defendants committed no less than two acts of racketeering activity as defined in O.C.G.A. § 16-14-3(9) in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics, said acts occurring within four (4) years of one another and not being isolated incidents.

463. The foregoing acts of mail fraud and wire fraud, of theft by taking and theft by deception, and of fraud under the Georgia Uniform Securities Act of 2008 constitute a pattern of racketeering activity within the meaning of O.C.G.A. § 16- 14-3(8), are not isolated incidents, and were all undertaken in furtherance of schemes that are interrelated in that, *inter alia*: (a) they had the similar purposes ofimproperly defrauding Hound out of millions of dollars; (b) they had similar participants, *i.e.*, Defendants Mohawk, Lorberbaum, Boykin, and Carson; and (c) they had similar methods of commission and results.

464. The foregoing racketeering acts also illustrate continuity and the threat of continuity, moreover, in that they have come to reflect Defendants' regular

way of doing business and Defendants used the misappropriated funds in connection with their ongoing ventures.

465. Defendants, acting in concert with one another and others, have engaged in a pattern of racketeering activity as defined in O.C.G.A. § 16-14-3(8) and acquired personal property, including money, belonging to Plaintiffs in violation of O.C.G.A. § 16-14-4(a) and (b).

466. By direct and proximate reason of Defendants' pattern of racketeering activity and the predicate acts it comprises, and as a result of Defendants' violations of O.C.G.A. § 16-14-4, Plaintiffs have suffered actual, consequential and other damages to their business and property in an amount to be proven at trial.

467. Plaintiffs have been injured in their business and property by reason ofDefendants racketeering activities in violation of O.C.G.A. § 16-14-4(a) and (b).  Plaintiffs are entitled to recover from Defendants, jointly and severally, compensatory damages equal to three times the amount of actual damages sustained by Plaintiffs, punitive damages in an amount to be determined at trial by the enlightened conscience of the jury, and attorneys' fees and costs of investigation and litigation reasonably incurred by Plaintiffs in this action.

468. In violating the Georgia RICO statute, Defendants have acted in bad faith and are thereby liable for Plaintiffs' attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11, in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### Against All Defendants for Violations of Georgia RICO Conspiracy, O.C.G.A. Section 16-14-4(c)

469. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

470. Defendants Mohawk, Lorberbaum, Boykin and Carson, in combination with one or more other persons identified herein, agreed and conspiredto violate O.C.G.A. § 16-14-4(a) and (b).

471. In particular, Defendants agreed with each other and with such persons to acquire or maintain an interest in or control of Plaintiffs' purchase of Mohawk common stock as well as conduct and participate in the conduct of the affairs of Mohawk, through a pattern of racketeering activity, including wire and mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C § 1343, theft by taking as well as theft by deception, in violation of O.C.G.A. § 16-8-2 and O.C.G.A. § 16-8-3, and fraud in connection with an offer, sale and/or purchase of securities to Plaintiffs inviolation of the Georgia Uniform Securities Act of 2008, O.C.G.A. § 10-5-1 et seq., as amended.

472. Defendants and the persons with whom they conspired knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate O.C.G.A. § 16-14-4(a) and (b) in violation of O.C.G.A. § 16-14-4(c).

473. Defendants were an enterprise as that term is defined in O.C.G.A. § 16-4-3(6); that is, a group of individuals and legal entities, foreign and domestic, associated in fact for the common purpose of fraudulently acquiring the assets of Plaintiffs.  The enterprise existed at all relevant times and still exists.

474. The enterprise existed and exists (to the extent that Defendants have continued to keep their fraudulent schemes a secret) for the sole improper purpose of furthering a scheme to defraud, steal, and wrongfully and unlawfully acquire theassets of Plaintiffs, and the enterprise continues to carry on efforts to conceal its prior activities against Plaintiffs.

475. Indeed, from at least 2016 and continuing to the present (by continuing to keep their fraudulent schemes), Defendants unlawfully, knowingly, and willfully,combined, conspired, confederated, and agreed with each other and with other persons to violate (1) Ga. Code § 16-14-4(a), through a pattern of racketeering activity, to acquire or maintain, directly or indirectly, an interest in, or control of Plaintiffs' personal property, including the monies it invested in

Mohawk commonstock; and (2) Ga. Code § 16-14-4(b), by being employed by or associated with anyenterprise to conduct or participate in, directly or indirectly, such enterprise througha pattern of racketeering activity.

476. The improper purpose and common objective of the conspiracy was toacquire for Defendants the Plaintiffs' assets to use for Defendants' benefit and the benefit of others.

477. At the inception and during the course of this conspiracy, Defendants and those employed by or associated with the enterprise, each personally agreed tothe overall objective of the conspiracy or to commit two racketeering acts.

478. The pattern of racketeering activity through which Defendants and their coconspirators agreed to conduct and participate in the conduct of the affairs of the enterprise in furtherance of their fraudulent scheme consisted, among other things, of multiple acts of mail fraud in violation of 18 U.S.C. § 1341, wire fraud inviolation of 18 U.S.C. § 1343, theft by taking and theft by deception within the meaning of O.C.G.A. § 16-8-2 and O.C.G.A. § 16-8-3, and violations of the GeorgiaUniform Securities Act of 2008, Ga. Code § 10-5-1 to 10-5-90.

479. These activities took place in, among other places, Georgia and affected interstate and foreign commerce.

480. Each coconspirator aided and abetted and rendered substantial assistance in the accomplishment of the scheme or artifice complained of herein.

In taking the actions set forth above, each coconspirator acted deliberately and while aware that the conduct in question would substantially assist the accomplishment of violations of the law. Each coconspirator was aware of making a contribution tothe conspiracy, common enterprise, and the common course of conduct complainedof above.

481. Each coconspirator participated in, aided and abetted, and conspired toaccomplish the illegal conduct herein alleged in order to obtain Plaintiffs' assets and to enrich the enterprise and its members at the expense of Plaintiffs.

482. As a direct and proximate result of said conspiracy, the overt acts taken in furtherance thereof, and the violations of O.C.G.A. § 16-14-4(c), Plaintiffs havebeen injured in its business and property by reason of the conspiracy in an amountto be proven at trial.

483. In their conspiracy to violate RICO, Defendants have acted in bad faith and are thereby liable for Plaintiffs' attorneys' fees and litigation expenses pursuantto O.C.G.A. § 13-6-11, in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

### Against All Defendants for Punitive Damages

484. Plaintiffs repeat and reallege the foregoing allegations as if set forth fully herein.

485. At times regarding the actions of Defendants complained of in this action, there is clear and convincing evidence that defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences,in violation of O.C.G.A. § 51-12-5.1(b).

486. Punitive damages should be awarded to Plaintiffs to punish and penalize Defendants, jointly and severally, for their actions that have harmed Plaintiffs, and to deter Defendants from ever again committing such actions, in an amount to be determined by a jury at trial.  O.C.G.A. § 51-12-5.1(c).

487. At all times, Defendants have acted with specific intent to harm Plaintiffs, such that an award of punitive damages by a jury at trial shall not be limited in amount.  O.C.G.A. § 51-12-5.1(f).

## TENTH CAUSE OF ACTION

### Against All Defendants for Attorneys' Fees and Expenses Under O.C.G.A. § 13-6-11

488. Plaintiffs repeat and reallege the foregoing allegations as if set forth fully herein.

489. Defendants have caused Plaintiffs unnecessary trouble and expense intheir attempt to recover amounts due to them.  As such, Plaintiffs are entitled to attorneys' fees and other expenses of litigation pursuant to O.C.G.A. § 13-6-11, andother applicable law.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Requiring Defendants to pay damages sustained by Plaintiffs by reasonof the acts and transactions alleged herein.

B.     Requiring Defendants to pay punitive damages for their violations of common law fraud and by reason of the acts and transactions alleged herein.

C.     Awarding Plaintiffs prejudgment interest and post-judgment interest as allowed pursuant to statutory and common law, as well as Plaintiffs' reasonableattorneys' fees, expert fees and other costs.

D.     Awarding such other and further relief as the Court may deem just and proper.

## XIII.  JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

DATED: March 25, 2022            By: ___*/s/ Debra Bernstein*___
                                     Debra Bernstein

                                 Debra Bernstein
                                 Ga. Bar No. 054998
                                 **QUINN EMANUEL URQUHART &
                                 SULLIVAN, LLP**
                                 1050 Crown Pointe Parkway, Ste. 500
                                 Atlanta, GA 30338
                                 Tel: 404-238-8444
                                 debrabernstein@quinnemanuel.com

                                 Rollo C. Baker  (*pro hac vice
                                 forthcoming*)
                                 Jesse Bernstein (*pro hac vice
                                 forthcoming*)
                                 **QUINN EMANUEL URQUHART &
                                 SULLIVAN, LLP**
                                 51 Madison Avenue, 22nd Fl
                                 New York, NY 10010
                                 rollobaker@quinnemanuel.com
                                 jessebernstein@quinnemanuel.com

                                 *Attorneys for Plaintiffs*

## **Local Rule 7.1D Certification**

Counsel for Plaintiffs hereby certifies that the text of this document has been prepared with Times New Roman 14 point, one of the fonts and point selections approved by the Court in Local Rule 5.1C.

By: ___*/s/ Debra Bernstein*___
         Debra Bernstein

Debra Bernstein
Ga. Bar No. 054998
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
1050 Crown Pointe Parkway, Ste. 500
Atlanta, GA 30338
Tel: 404-238-8444
debrabernstein@quinnemanuel.com

164